NO. 15-24-00114-CV

ACCEPTED
15-24-00114-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
12/9/2025 4:20 PM
CHRISTOPHER A. PRINE
CLERK

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
12/9/2025 4:20:34 PM
CHRISTOPHER A. PRINE
Clerk

# In the Fifteenth District Court of Appeals

---

**Cecile Erwin Young, in Her Official Capacity as Executive Commissioner of the Texas Health and Human Services Commission,**
*Appellant,*

**v.**

**Cook Children's Health Plan; Texas Children's Health Plan; Superior HealthPlan, Inc.; and Wellpoint Insurance Company,**
*Appellees.*

---

On Appeal from Cause No. D-1-GN-24-003839, in the 455th Judicial District Court of Travis County, Texas / Honorable Laurie Eiserloh, Presiding Judge

---

**BRIEF OF APPELLEES COOK CHILDREN'S HEALTH PLAN AND TEXAS CHILDREN'S HEALTH PLAN**

---

NORTON ROSE FULBRIGHT US LLP

Susan Feigin Harris
State Bar No. 06876980
susan.harris@nortonrosefulbright.com
Warren S. Huang
State Bar No. 00796788
warren.huang@nortonrosefulbright.com
1550 Lamar, Suite 2000
Houston, Texas 77010
Telephone: (713) 651-5151

ALEXANDER DUBOSE & JEFFERSON

Amy Warr
State Bar No. 00795708
awarr@adjtlaw.com
Anna M. Baker
State Bar No. 00791362
abaker@adjtlaw.com
100 Congress Avenue, Suite 1450
Austin, Texas 78701
Telephone: (512) 482-9300

(Continued on Next Page)

Paul D. Trahan
State Bar No. 24003075
paul.trahan@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
Telephone: (512) 474-5201

Thomas A. Coulter
tom.coulter@nortonrosefulbright.com
State Bar No. 04885500
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1100
Washington, D.C. 20001
Telephone: (202) 662-0200

*Counsel for Appellee*
*Texas Children's Health Plan*

Karen C. Burgess
State Bar No. 00796276
kburgess@burgesslawpc.com
Katie Dolan-Galaviz
State Bar No. 24069620
kgalaviz@burgesslawpc.com
BURGESS LAW PC
404 West 13th Street
Austin, Texas 78701
Telephone: (512) 482-8808

Matthew P. Gordon
*Admission Pro Hac Vice*
mgordon@perkinscoie.com
PERKINS COIE LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Telephone: (206) 359-8000

*Counsel for Appellee*
*Cook Children's Health Plan*

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

**PAGE**

INDEX OF AUTHORITIES ................................................................................ iv

STATEMENT OF THE CASE ............................................................................. 1

STATEMENT REGARDING ORAL ARGUMENT ........................................... 4

ISSUES PRESENTED ........................................................................................ 5

SUMMARY OF THE ARGUMENT ................................................................... 6

STATEMENT OF FACTS .................................................................................. 9

    I.      The Children's Plans have been trusted partners to HHSC since the beginning of Medicaid managed care over twenty-five years ago ................................................................................................ 9

    II.    The procurement has upended Medicaid managed care in Texas and poses an existential threat to the Children's Plans ..................... 12

ARGUMENT ..................................................................................................... 13

    I.      The trial court did not err in denying the Commissioner's plea to the jurisdiction ................................................................................. 13

           A.    The Children's Plans defeated the Commissioner's immunity by raising, at a minimum, a fact question on their *ultra vires* claims ........................................................... 14

                    1.    The Commissioner has failed to consider past performance ................................................................. 16

                    2.    The Commissioner has failed to consider provider networks and quality initiatives ................................... 20

                    3.    The Commissioner has not evaluated and certified the bidders ................................................................... 24

i

4. The Commissioner is not promoting continuity of care or reducing administrative and nonfinancial barriers ................................................................... 24

5. The Commissioner has not considered different plans for different populations ..................................... 25

6. The Commissioner intends to award "mandatory" CHIP contracts ............................................................. 27

7. The Commissioner's improper disclosure to Aetna tainted the entire procurement ........................... 28

B. The Commissioner's other jurisdictional arguments rely on mischaracterizations of the Children's Plans *ultra vires* claims. ................................................................. 30

1. The Children's Plans have standing. ........................... 30

2. The Children's Plans' claims are ripe ......................... 33

3. The exhaustion-of-remedies doctrine does not apply. ............................................................................. 37

4. The Children's Plans properly sued the Commissioner ................................................................ 40

5. The Commissioner's authority is limited by statutory criteria and requirements .............................. 42

6. The Children's Plans do not seek an improper "redo" of the procurement ........................................... 44

II. The trial court did not abuse its discretion in granting a temporary injunction ................................................................... 48

A. The temporary injunction seeks to preserve the status quo by preventing further unlawful conduct by the Commissioner ................................................................... 49

B.    The Children's Plans and their members face imminent, irreparable harm if the temporary injunction is reversed ........ 50

      1.    The continued viability of the Children's Plans is at risk ........................................................................ 50

      2.    The imminent risk of irreparable harm extends to beneficiaries ................................................................ 53

      3.    The Commissioner cannot justify these irreparable harms ............................................................ 56

C.    The balance of the equities overwhelmingly supports a temporary injunction ................................................................ 58

D.    The temporary injunction does not violate Texas Rule of Civil Procedure 683 ................................................................ 61

E.    The trial court did not abuse its discretion in excluding the procurement's consensus scoring rubrics ........................ 64

CONCLUSION ............................................................................................... 68

CERTIFICATE OF COMPLIANCE WITH TEXAS RULE OF APPELLATE PROCEDURE 9.4(I)(3) ....................................................... 70

CERTIFICATE OF SERVICE ........................................................................ 71

# INDEX OF AUTHORITIES

**PAGE(S)**

**CASES**

*Abbott v. Doe*,
  691 S.W.3d 55 (Tex. App.—Austin 2024, no pet.)............................................ 34

*Adarand Constructors, Inc. v. Peña*,
  515 U.S. 200 (1995) ........................................................................ 31

*Brennan v. City of Willow Park*,
  376 S.W.3d 910 (Tex. App.—Fort Worth 2012, pet. denied)........................... 37

*Butnaru v. Ford Motor Co.*,
  84 S.W.3d 198 (Tex. 2002) ........................................................ 48, 58

*Cash Am. Int'l Inc. v. Bennett*,
  35 S.W.3d 12 (Tex. 2000) ............................................................... 38

*Chambers-Liberty Cntys. Navigation Dist. v. State*,
  575 S.W.3d 339 (Tex. 2019) ...................................................... 43, 58

*City of Austin v. Util. Assocs., Inc.*,
  517 S.W.3d 300 (Tex. App.—Austin 2017, pet. denied) ................................ 47

*City of Brownsville v. Alvarado*,
  897 S.W.2d 750 (Tex. 1995) ............................................................. 64

*City of Corpus Christi v. Pub. Util. Comm'n of Tex.*,
  188 S.W.3d 681 (Tex. App.—Austin 2003, pet. denied) ................................ 28

*City of El Paso v. Heinrich*,
  284 S.W.3d 366 (Tex. 2009) ....................................................*Passim*

*City of Houston v. Norcini*,
  317 S.W.3d 287 (Tex. App.—Houston [1st Dist.] 2009,
  pet. denied) ............................................................................... 35

*Daniel v. Goesl*,
  341 S.W.2d 892 (Tex. 1960) ............................................................. 48

*Data Foundry, Inc. v. City of Austin*,
620 S.W.3d 692 (Tex. 2021) ............................................................... 30

*Dubai Petroleum Co. v. Kazi*,
12 S.W.3d 71 (Tex. 2000) .................................................................... 39

*Elcon Enters., Inc. v. Wash. Metro. Area Transit Auth.*,
977 F.2d 1472 (D.C. Cir. 1992)........................................................... 32

*EIS Dev. II, LLC v. Buena Vista Area Ass'n*,
715 S.W.3d. 689 (Tex. 2025) ............................................................... 46

*Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*,
281 S.W.3d 215 (Tex. App.—Fort Worth 2009, pet. denied) ........................... 50

*Function Media, LLC v. Google, Inc.*,
No. 2:07-CV-279-CE, 2010 WL 276093 (E.D. Tex. Jan. 15, 2010)................. 68

*Gee v. Liberty Mut. Fire Ins. Co.*,
765 S.W.2d 394 (Tex. 1989) ................................................................ 64

*Gunn v. McCoy*,
554 S.W.3d 645 (Tex. 2018) ................................................................ 65

*Hall v. McRaven*,
508 S.W.3d 232 (Tex. 2017) ......................................................*Passim*

*Hensley v. State Comm'n on Jud. Conduct*,
692 S.W.3d 184 (Tex. 2024) ................................................................ 40

*Hous. Belt & Terminal Ry. Co. v. City of Houston*,
487 S.W.3d 154 (Tex. 2016) ......................................................*Passim*

*In re FINA Oil & Chem. Co.*,
No. 13-98-640-CV, 1999 WL 33589153 (Tex. App.—
Corpus Christi–Edinburg Mar. 11, 1999, no pet.)
(not designated for publication)........................................................... 67

*In re Luther*,
620 S.W.3d 715 (Tex. 2021) (orig. proceeding) (per curiam)......................... 63

*In re Newton*,
146 S.W.3d 648 (Tex. 2004) (orig. proceeding) ..................................... 59

v

*In re Oncor Elec. Delivery Co.*,
630 S.W.3d 40 (Tex. 2021) (orig. proceeding) ............................................ 39, 40

*In re State*,
711 S.W.3d 641 (Tex. 2024) (orig. proceeding) ................................................ 59

*In re Stetson Renewables Holdings, LLC*,
658 S.W.3d 292 (Tex. 2022) (orig. proceeding) ................................................ 45

*Indep. Capital Mgmt., LLC v. Collins*,
261 S.W.3d 792 (Tex. App.—Dallas 2008, no pet.) ......................................... 63

*Intercont'l Terminals Co. v. Vopal N. Am., Inc.*,
354 S.W.3d 887 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ..................... 52

*Janek v. Gonzalez*,
No. 03-11-00113-CV, 2013 WL 1748795 (Tex. App.—Austin
Apr. 17, 2013, no pet.) ..................................................................................... 38

*Kilgore ISD v. Axberg*,
535 S.W.3d 21 (Tex. App.—Texarkana 2017, no pet.) ..................................... 37

*Klumb v. Hous. Mun. Emps. Pension Sys.*,
458 S.W.3d 1 (Tex. 2015) ................................................................................. 42

*Lazarides v. Farris*,
367 S.W.3d 788 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ................... 32

*Leddy v. Becerra*,
617 F. Supp. 3d 116 (E.D.N.Y. 2022) ............................................................... 53

*Marble Falls ISD v. Scott*,
275 S.W.3d 558 (Tex. App.—Austin 2008, pet. denied) .................................. 35

*McElroy v. Unifund CCR Partners*,
No. 14-07-00661-CV, 2008 WL 4355276
(Tex. App.—Houston [14th Dist.] Aug. 26, 2008, no pet.) .............................. 66

*Morath v. Kingsville ISD*,
710 S.W.3d 918 (Tex. App. [15th Dist.] 2025, no pet.) ................................... 45

*Muth v. Voe*,
691 S.W.3d 93 (Tex. App.—Austin 2024, pet. filed) ....................................... 55

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
992 F.2d 430 (2d Cir. 1993) ................................................................. 51

*Ogletree v. Glen Rose ISD,*
314 S.W.3d 450 (Tex. App.—Waco 2010, pet. denied)................................... 40

*Owens-Corning Fiberglas Corp. v. Malone*,
972 S.W.2d 35 (Tex. 1998) ....................................................... 64, 65

*Patel v. Tex. Dep't of Licensing & Regulation*,
469 S.W.3d 69 (Tex. 2015) ................................................................ 33

*Perry v. Del Rio*,
66 S.W.3d 239 (Tex. 2001) ................................................................ 37

*Presidio ISD v. Scott*,
309 S.W.3d 927 (Tex. 2010) .............................................................. 13

*Riner v. City of Hunters Creek*,
403 S.W.3d 919 (Tex. App.—Houston [14th Dist.] 2023, no pet.)................... 35

*S.C. v. M.B.*,
650 S.W.3d 428 (Tex. 2022) .............................................................. 39

*Smith v. Abbott*,
311 S.W.3d 62 (Tex. App.—Austin 2010, pet. denied) ............................ 38, 43

*State v. City of San Marcos*,
714 S.W.3d 224 (Tex. App. [15th Dist.] 2025, pet. denied) ...................... 16, 60

*State v. Hollins*,
620 S.W.3d 400 (Tex. 2020) .............................................................. 58

*Tanguy v. Laux*,
259 S.W.3d 851 (Tex. App.—Houston [1st Dist.] 2008, no pet.)................... 48

*Taylor Hous. Auth. v. Shorts*,
549 S.W.3d 865 (Tex. App.—Austin 2018, no pet.)......................................... 62

*Tex. Dep't of Parks & Wildlife v. Miranda*,
133 S.W.3d 217 (Tex. 2004) ........................................................... 14, 20

*Tex. Dep't of Protective & Regul. Servs. v. Mega Child Care, Inc.*,
    145 S.W.3d 170 (Tex. 2004) ............................................................... 39

*Tex. Dep't of State Health Servs. v. Holmes*,
    294 S.W.3d 328 (Tex. App.—Austin 2009, pet. denied) ................................. 51

*Tex. Tech Univ. Health Scis. Ctr. v. Rao*,
    105 S.W.3d 763 (Tex. App.—Amarillo 2003, pet. dism'd) ............................. 62

*Texas v. Biden*,
    10 F.4th 538 (5th Cir. 2021) .............................................................. 59

*Tinton Falls Lodging Realty, LLC v. United States*,
    800 F.3d 1353 (Fed. Cir. 2015) .......................................................... 31

*TrueEX, LLC v. MarkitSERV Ltd.*,
    266 F. Supp.3d 705 (S.D.N.Y. 2017) ................................................... 51

*Union Carbide Corp. v. Synatzske*,
    438 S.W.3d 39 (Tex. 2014) ............................................................... 26

*VAS Realty, LLC v. United States*,
    26 F.4th 945 (Fed. Cir. 2022) ............................................................ 31

*Walker v. Gutierrez*,
    111 S.W.3d 56 (Tex. 2003) ............................................................... 65

*Welch v. Brown*,
    551 F. App'x 804 (6th Cir. 2014) ....................................................... 53

*Westheimer ISD v. Brockette*,
    567 S.W.2d 780 (Tex. 1978) ............................................................. 38

*Wilson v. Commun. Health Choice Tex., Inc.*,
    607 S.W.3d 843 (Tex. App.—Austin 2020, pet. denied) ...................... 32, 36, 43

## STATUTES & RULES

1 TEX. ADMIN. CODE § 391.101(2) ........................................................ 28

1 TEX. ADMIN. CODE § 391.209(3)(A) .................................................... 28

1 TEX. ADMIN. CODE § 391.303(d) ............................................................ 39

1 TEX. ADMIN. CODE § 391.307(d) ............................................................ 42

34 TEX. ADMIN. CODE § 20.208(d)(3) ................................................... 28, 29

Acts 2023, 88th Leg., R.S., Ch. 769, § 3.01(3) ........................................ 2

TEX. GOV'T CODE § 311.016(2) ............................................................... 16

TEX. GOV'T CODE § 524.0002(b)(4) ....................................................... 41

TEX. GOV'T CODE § 533.001(7) ............................................................... 26

TEX. GOV'T CODE § 533.002 .................................................................... 25

TEX. GOV'T CODE § 533.003(a)(1) .......................................................... 20

TEX. GOV'T CODE § 533.003(a)(3) .......................................................... 25

TEX. GOV'T CODE § 533.0035(a) ............................................................. 24

TEX. GOV'T CODE § 533.004 .................................................................... 27

TEX. GOV'T CODE § 536.052(d) ............................................................... 21

TEX. GOV'T CODE § 552.104(a) ............................................................... 29

TEX. GOV'T CODE § 2155.144 .................................................................. 27

TEX. GOV'T CODE § 2155.144(c) ..................................................... 16, 19, 22

TEX. GOV'T CODE § 2155.144(d) ..................................................... 16, 19, 22

TEX. GOV'T CODE § 2155.144(n) .............................................................. 22

TEX. HEALTH & SAFETY CODE § 62.155 .................................................. 27

TEX. HEALTH & SAFETY CODE § 62.155(c)(1) ......................................... 27

TEX. R. APP. P. 7.2(a) ................................................................................. 1

TEX. R. CIV. P. 199.2 .................................................................................. 67

TEX. R. CIV. P. 683 ..................................................................................... 62

T<small>EX</small>. R. E<small>VID</small>. 803(6)(D) ...................................................................................... 65

## SECONDARY AUTHORITIES

Becky Staiger, *Disruptions to the Patient-Provider Relationship and Patient Utilization and Outcomes: Evidence from Medicaid Managed Care*, 81 J. H<small>EALTH</small> E<small>CON</small>. 102574 (2022) ........................................................ 54

Tex. Att'y Gen. Open Recs. Letter Ruling OR2023-034773 ................................ 29

Tex. Att'y Gen. Open Recs. Letter Ruling OR2024-018260 ................................ 29

Tex. Att'y Gen. Open Recs. Letter Ruling OR2024-019071 ................................ 29

## STATEMENT OF THE CASE

**Parties:**   Plaintiffs/Appellees: Cook Children's Health Plan ("Cook Children's"), Texas Children's Health Plan ("Texas Children's"), Superior HealthPlan, Inc. ("Superior"), and Wellpoint Insurance Company ("Wellpoint").

All of the Plaintiffs/Appellees will be referred to as "the Health Plans," and Cook Children's and Texas Children's will be referred to as "the Children's Plans."

Defendant/Appellee: Cecile Erwin Young, in Her Official Capacity as Executive Commissioner of the Texas Health and Human Services Commission ("the Commissioner").[1] The agency will be referred to as "HHSC."

**Trial Court:**   Hon. Laurie Eiserloh, 455th Judicial District Court, Travis County, Texas.

**Nature of the Case:**   The Health Plans separately filed *ultra vires* claims to enjoin the Commissioner's continued unlawful execution and implementation of Texas's STAR & CHIP and STAR Kids procurements.[2] CR.3308-84,

---

[1] The Governor recently announced Commissioner Young will be retiring as the Executive Commissioner of HHSC, effective January 2, 2026. https://gov.texas.gov/news/post/governor-abbott-statement-on-retirement-of-texas-hhs-executive-commissioner-young. Her successor will automatically be substituted in this appeal at that time. *See* TEX. R. APP. P. 7.2(a).

[2] STAR is a Medicaid managed care program that provides coverage to low-income children, pregnant women, and families. 6.RR.102-03. CHIP provides low-cost health coverage for children (and unborn children of pregnant women) whose families earn too much to qualify for Medicaid but are unable to afford commercial health insurance. 6.RR.86, 103-04. STAR Kids, which is the subject of a separate but also-enjoined procurement, is a Medicaid program that provides healthcare benefits to children and young adults with disabilities. 6.RR.103.

1

3510-3817, 4231-4715, 4716-5835.[3] Those proceedings were consolidated. CR.2778.

**Trial Court Proceedings:** The Commissioner filed a plea to the jurisdiction seeking dismissal of the Health Plans' claims, CR.2949-3113, and the Children's Plans applied for a temporary injunction barring further *ultra vires* acts by the Commissioner pending the final disposition of their claims, CR.3308-3509, 4716-5835.

**Trial Court Disposition:** On October 4, 2024, following a four-day evidentiary hearing, the trial court signed a ten-page order denying the Commissioner's plea and granting a temporary injunction. CR.5875-84 (App.Tab.1).

The trial court found that:

- The Commissioner violated thirteen statutes, constitutional provisions, and administrative rules, CR.5877-78, which "each singly and together collectively, have resulted in intended contract awards that will be invalid and unlawful, and the further execution and implementation of such intended contract awards will be ultra vires acts," CR.5878;[4]

---

[3] "CR.__" refers to the Clerk's Record. "__.RR.__" refers to the volume and page number of the Reporter's Record. "Commissioner.Br.__" refers to the Commissioner's opening brief on the merits. "Commissioner.Resp.2nd.MFET.__" refers to the Commissioner's response to the Health Plans' second motion for extension of time to file their response briefs on the merits. "Molina.Br.__" refers to the merits (now amicus) brief filed by Molina Healthcare of Texas, Inc. ("Molina"). "Aetna.Br.__" refers to the merits (now amicus) brief filed by Aetna Better Health of Texas, Inc. ("Aetna"). "App.Tab.__" refers to the Appendix attached to this brief.

[4] Effective April 1, 2025, portions of the Texas Government Code were repealed and recodified. Acts 2023, 88th Leg., R.S., Ch. 769, § 3.01(3). Section 536.052 has been recodified without substantive change as Section 543A.0052, and Section 533.003 has been recodified without substantive change as Sections

- Execution and implementation of the proposed contracts would imminently and irreparably harm the Children's Plans, including "threaten[ing] Cook Children's financial viability" and potentially "lead[ing] to [its] forced wind-down" and "threatening the future viability" of Texas Children's, CR.5879-80;

- Execution and implementation of the proposed contracts would irreparably harm the public interest by "disrupt[ing]" STAR & CHIP beneficiaries' "access to care and continuity of care, thereby threatening the medical care and the very health and welfare of those beneficiaries," CR.5882-83; and

- An injunction would not harm either HHSC or the public interest because "(1) operations under the intended contract awards are not scheduled to start until September 1, 2025, and (2) HHSC has previously delayed the [procurement] several times and was able to continue providing coverage through the current STAR & CHIP contracts by extending the contracts in effect at the time," CR.5882.

The trial court then ordered temporary injunctive relief against the Commissioner, enjoining her from further carrying out those *ultra vires* acts, including:

awarding, signing, entering into, executing, implementing, or otherwise taking action to effectuate or perform any contracts resulting from or in connection with the STAR & CHIP [procurement] or to further the procurement or

540.0204 and 540.0205. *Id*. For consistency, this brief cites the statutes as they existed at the time of the temporary injunction hearing.

3

contracting processes for the STAR & CHIP [procurement].

CR.5883.[5]

On October 21, 2024, the Commissioner appealed the trial court's order denying the plea and granting a temporary injunction. CR.5957-60.

## STATEMENT REGARDING ORAL ARGUMENT

The trial court correctly applied well-established Texas law to the facts of this case. But the stakes—legal and practical—are high. The Commissioner's assertion of absolute, unreviewable authority to conduct the procurement would gut the *ultra vires* doctrine and give her unchecked authority to ignore important limits on her discretion, including statutory directives governing how the State's most significant procurements must be conducted. The procurement challenged here—the largest in Texas history, worth $10 billion annually for up to twelve years—will directly affect the healthcare of millions of women and children across Texas and determine the Children's Plans' continued existence . The Court should grant oral argument.

---

[5] The trial court also made findings regarding the separate STAR Kids program, *supra* at 1 n.2, for which HHSC is currently evaluating proposals. The trial court found that the STAR Kids procurement will be conducted in the same flawed manner as the STAR & CHIP procurement and "will therefore also violate statutory and regulatory requirements and be ultra vires." CR.5878-79. Accordingly, the trial court also enjoined the Commissioner from "further proceeding with the procurement of, issuing a notice of intent to award or awarding contracts under, or otherwise implementing results from the STAR Kids" procurement. CR.5883.

## ISSUES PRESENTED

1.      Did the trial court erroneously deny the Commissioner's plea to the jurisdiction where (a) the Children's Plans overcame the Commissioner's sovereign immunity by raising a fact question on their *ultra vires* claims, (b) they have standing to assert their *ultra vires* claims, (c) their claims are ripe, (d) the exhaustion-of-administrative-remedies doctrine does not apply, (e) the Commissioner is the proper defendant, (f) the Commissioner's authority to undertake the procurement is limited by statute, and (g) they properly seek only prospective relief?

2.      Did the trial court abuse its discretion in granting the temporary injunction where (a) the Children's Plans demonstrated a probable right to relief on their *ultra vires* claims, (b) they and their members will suffer irreparable harm if the procurement is allowed to proceed while the case is litigated, (c) the balance of the equities overwhelmingly favors the injunction's issuance, (d) the injunction complies with Texas Rule of Civil Procedure 683, and (e) the trial court did not abuse its discretion in excluding HHSC's consensus scoring rubrics and, in any event, the exclusion of the rubrics did not probably result in the rendition of an improper judgment?

## SUMMARY OF THE ARGUMENT

The Legislature entrusted HHSC with a vital task—selecting the health plans best suited to manage healthcare for Texas Medicaid participants over the next decade. With the health of millions of Texans and up to $120 billion at stake, the Legislature understandably chose not to leave these decisions to the agency's sole and unfettered discretion. Instead, it enacted a detailed statutory framework HHSC was required to follow.

That didn't happen. The Commissioner defied those statutory mandates, with devastating consequences. Local, nonprofit plans like the Children's Plans—who are affiliated with world-renowned children's hospitals, provide high-quality, uniquely integrated care, and have been part of Texas's Medicaid managed care program since its inception more than two decades ago—stand to be excluded entirely. In their places, subsidiaries of national for-profit insurers will receive contracts—some of which, by HHSC's own metrics, deliver substandard care. Shortly before the procurement, HHSC delivered a blistering assessment of one such plan, Molina, concluding it "does not meet quality of care measure ***minimum*** performance standards in ***any*** of the programs it operates in." 5.RR.262 (emphasis added). Yet Molina somehow received the procurement's top score and, as it stands, many thousands of Medicaid members will have to transfer their healthcare coverage to Molina from the Children's Plans—which, in turn, might cease to exist.

6

These shocking results raise an obvious question: How did the procurement go so wrong? Discovery and a four-day evidentiary hearing provided the answer. The Commissioner violated thirteen statutes, constitutional provisions, and administrative rules, including several that require her to consider past performance and quality to ensure high-quality plans are selected over substandard ones. At the hearing, witness after witness acknowledged the relevance of these requirements but conceded the lack of *any* evidence of their consideration. The result? Another botched procurement that, if allowed to stand, will force all 500,000-plus of the Children's Plans' members to switch to lower-quality, profit-driven health plans.

The decision to ignore quality data is inexplicable. How a plan served its members in the past is perhaps the best indication of how it will serve them in the future. But this case is not about mere irrationality—it's about illegality. The Legislature sought to avoid this very scenario by *commanding* consideration of past performance and granting preferences to plans that have successfully implemented quality initiatives. But the Commissioner ignored those legislative imperatives entirely. Her disregard of the law justifies *ultra vires* claims to prevent her from continuing to defy statutory mandates and inflicting irreparable harm on the Children's Plans and their members—including some of Texas's most vulnerable children and expectant mothers.

In light of her earlier admissions and the overwhelming evidence, the Commissioner struggles to defend the procurement. She does not claim, for instance, that she documented past performance or considered quality initiatives because *she did not*. Without a factual leg to stand on, the Commissioner resorts to misdirection. Drawing from a grab bag of jurisdictional arguments, she suggests the Children's Plans cannot assert *ultra vires* claims challenging her discretion to conduct the procurement, even though the Texas Supreme Court has explained the doctrine exists to prevent officials with limited discretion (like the Commissioner) from exceeding the bounds of their statutory authority. She asserts the Children's Plans' claims must exhaust administrative remedies before bringing suit, even though exhaustion is not required for common-law *ultra vires* claims and would render their requested relief improperly retrospective. And she claims the Children's Plans seek "premature" judicial review of an agency decision to force a "redo" of the procurement—even though their claims are ripe and that is neither the doctrinal basis for their claims nor their requested relief.

Setting aside the Commissioner's jurisdictional red herrings, the path to affirming the temporary injunction is clear. The trial court's factual findings, which must be accorded significant deference, show that the Children's Plans demonstrated a probable right to relief on their claims (which fall squarely within the *ultra vires* doctrine), a likelihood of irreparable harm, and a balance of equities overwhelmingly

favoring injunctive relief. As a result, this Court should affirm the denial of the Commissioner's plea to the jurisdiction and grant of the temporary injunction.

**STATEMENT OF FACTS**

**I.     The Children's Plans have been trusted partners to HHSC since the beginning of Medicaid managed care over twenty-five years ago.**

The Children's Plans are local, nonprofit managed care organizations ("MCOs") that provide services to STAR & CHIP and STAR Kids members as part of fully integrated pediatric-healthcare systems centered around world-renowned and highly ranked children's hospitals—Texas Children's Hospital in Houston and Cook Children's Medical Center in Fort Worth. Unlike national, for-profit plans, the Children's Plans do not seek to maximize market share across the state. 8.RR.132-33; CR.4035, 4727, 4741. Rather, they operate only within the geographic regions served by their respective affiliated hospitals. 8.RR.132-33; CR.4035, 4741, 4747.

**Texas Children's.** Texas Children's is the first MCO in the country created just for children. CR.4717. For over 25 years, since the inception of Medicaid managed care and the adoption of CHIP in Texas, Texas Children's has dedicated itself exclusively to providing high-quality care to approximately 420,000 vulnerable children and expectant mothers in the Harris and Jefferson Service Areas. CR.85, 4717; 8.RR.35-36, 39; 9.RR.PX.161 at 234.

Texas Children's has a longstanding affiliation with Texas Children's Hospital, the largest children's health system in the United States; Texas Children's

Pediatrics; Texas Children's Urgent Care; and affiliated specialty physicians and practitioners with academic affiliations with Baylor College of Medicine. This pediatric-focused health system provides unique and critical access to some of the nation's leading experts in pediatric and maternal medicine. CR.134-35, 2279. These affiliations allow close coordination of care and reduction of administrative burdens for patients and families, which standalone health plans cannot offer. 8.RR.18.

HHSC has recognized the extraordinary care Texas Children's provides. When Medicaid members do not enroll with a plan, HHSC auto-assigns them one based on various criteria, with performance quality at the top, so that the highest-quality plans receive the most members. 8.RR.40-41. Reflecting its high quality ratings, nearly half (43%) of auto-enrollees are assigned to Texas Children's even though there are five health plans in the Harris Service Area; by contrast, Molina, the top scorer in the procurement, receives only 3%. 8.RR.42-43. Texas Children's is also the popular choice among members who affirmatively choose a plan—nearly 50% of members select it over the other health plans. 8.RR.43-44; 9.RR.PX.161 at 234.

**Cook Children's.** Cook Children's Medical Center, the cornerstone of the larger Cook Children's healthcare system, has served Fort Worth families for over 100 years. 8.RR.129. Its affiliated health plan was formed in 1999 (when Texas transitioned its Medicaid program to a managed-care model) and has, for more than

two decades, been an integral component of STAR & CHIP and STAR Kids. 8.RR.129-30. As part of the only fully integrated pediatric-healthcare system in the Fort Worth area, Cook Children's members benefit from shared electronic records and collaboration and coordination between doctors, nurses, and other staff. 8.RR.133-35. The health plan is able to leverage this network to provide additional services not otherwise covered by the State, such as fresh groceries for high-risk pregnant members, transportation to and from medical appointments and social-service offices, and even generators to assist members with medical needs during natural disasters. 8.RR.135-37.

These efforts have gone neither unnoticed nor unrewarded. Cook Children's consistently receives "A" grades from the Texas Comptroller of Public Accounts for its service related to STAR & CHIP, routinely earns top marks on quality metrics, and boasts higher provider satisfaction than other plans. CR.3316. HHSC's most recent public measurements of quality outcomes also show that, in 2022, Cook Children's earned among the most "above high performance standards" in the state—higher than all current Tarrant Service Area contractors and presumptive awardees for STAR, and more than twice as high as Molina's 21% mark. CR.3318. For CHIP, the differences are even more dramatic—Cook Children's had nearly five times as many performance measures "above high performance standards" as Molina's 9% score. *Id.*

**II.** **The procurement has upended Medicaid managed care in Texas and poses an existential threat to the Children's Plans.**

HHSC has canceled multiple STAR & CHIP procurements over the past decade because of pervasive errors. 5.RR.180; 6.RR.146, 233; 7.RR.11. This procurement is no different.

In December 2022, the Commissioner announced HHSC's new procurement. CR.135. Despite boasting about consulting with Mercer, an outside firm, to design the procurement, 6.RR.136, 196-97, the Commissioner ignored essential Mercer recommendations designed to ensure compliance with Texas law, including one to expressly award points based on past performance, 5.RR.181; *infra* at 17. The Commissioner reviewed and scored written proposals and oral presentations from eighteen bidders. 9.RR.PX.38 at 23; 9.RR.PX.92 at 5-6. On top of the other legal errors that permeated the procurement, HHSC admitted it mistakenly provided Aetna—one of the bidders—with other bidders' proposals while the procurement was ongoing, **before** Aetna's oral presentation. 5.RR.137-40.

On March 7, 2024, the Commissioner issued a notice of intent to award, announcing the health plans with which HHSC intended to contract to administer STAR & CHIP for at least the next six (and potentially up to twelve) years. 5.RR.81, 203-04; 9.RR.PX.95. The top scorers received their first-choice selections of preferred service areas (up to seven) among Texas's thirteen service areas. CR.3519-22; 9.RR.PX.38 at 17-18, 29-30.

The Children's Plans learned that, for the first time in program history, they would *not* receive contracts. 9.RR.PX.95. Instead, their respective service areas would be served almost exclusively by subsidiaries of large, national organizations—all for-profit and none with the Children's Plans' deep roots in their communities or longstanding commitment to the health of Texas's children and expectant mothers. *Id*.; CR.3310-11, 4717-18.

These results pose an existential threat to the Children's Plans because Medicaid and CHIP beneficiaries are the sole members they serve. Without these contracts, they will likely cease to exist. 8.RR.35-36, 39, 159-60. The results will also harm their members. Every one of the approximately 420,000 Texas Children's members and 115,000 Cook Children's members will be forced to switch to new health plans like Molina and Aetna that do not offer the benefits of a fully integrated pediatric-healthcare system. 8.RR.39, 133, 135. Many will also have to find new healthcare providers. 8.RR.22, 161. Statewide, *more than 1.5 million* STAR & CHIP beneficiaries will be forced to switch health plans. 5.RR.190; 6.RR.97-98; 7.RR.38.

## ARGUMENT

I. **The trial court did not err in denying the Commissioner's plea to the jurisdiction.**

While an order on a plea to the jurisdiction is reviewed *de novo*, *Presidio ISD v. Scott*, 309 S.W.3d 927, 929 (Tex. 2010), "in a case in which the jurisdictional

13

challenge implicates the merits of the plaintiffs' cause of action and the plea to the jurisdiction includes evidence," the reviewing court must examine "the relevant evidence to determine if a fact issue exists," *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex. 2004). In making this determination, the reviewing court "take[s] as true all evidence favorable to the nonmovant" and "indulge[s] every reasonable inference and resolve[s] any doubts in the nonmovant's favor." *Id.* at 228. If the evidence creates a fact question regarding the jurisdictional issue, then the denial of the plea must be affirmed. *Id.* at 227-28.

Here, the Commissioner failed to meet her heavy burden to prove lack of jurisdiction as a matter of law.

### A. The Children's Plans defeated the Commissioner's immunity by raising, at a minimum, a fact question on their *ultra vires* claims.

The Children's Plans seek prospective injunctive relief to prevent the Commissioner from continuing to defy statutory mandates in the procurement. Their claims and the temporary injunction thus fall squarely within the *ultra vires* exception to sovereign immunity. As the Supreme Court has clarified, immunity "does not protect **every** act by a government officer that requires some exercise of judgment—a government officer with some discretion to interpret and apply a law may nonetheless act 'without legal authority,' and thus *ultra vires*, if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Hous. Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016). The Court

14

contrasted cases involving "**absolute** discretion—discretion where no specific, substantive, or objective standards govern the exercise of judgment" and immunity thus applies—with cases where an official has "**some** authority or discretion" and "his determinations are [] *ultra vires* because he acted beyond his granted discretion in making them." *Id.* at 161 (emphasis added). In other words, an *ultra vires* claim lies where an official "act[s] pursuant to, yet outside the limits of, a statutory grant of authority"—such as, for example, "making the type of determination which they had authority to make … in a way the law did not allow." *Id.* at 162 (citing *City of El Paso v. Heinrich*, 284 S.W.3d 366, 371-78 (Tex. 2009)).

Although the Commissioner has exclusive authority to plan and direct Medicaid procurements, she does not enjoy absolute discretion in **how** she conducts them. Instead, the Legislature expressly limited her authority by enacting procurement statutes requiring her to consider certain factors and apply specific preferences, including consideration of bidders' past performance and preference for plans that have successfully implemented quality initiatives. The Commissioner ignored those guardrails. HHSC's own documents and its leadership's testimony show that the agency's process for scoring bids was designed to—and did—omit those required factors and preferences. They were **absent** from the scoring sheets used to evaluate bids. They were **absent** from the training materials for the evaluators. And the evaluators were **never** instructed to consider them.

15

The *ultra vires* doctrine exists to remedy the Commissioner's defiance of the Legislature's mandates. *See, e.g.*, *State v. City of San Marcos*, 714 S.W.3d 224, 239 (Tex. App. [15th Dist.] 2025, pet. denied) ("Governmental immunity does not bar a suit that seeks to bring local government officials into compliance with state law.").[6]

**1.    The Commissioner has failed to consider past performance.**

In a procurement, HHSC "***shall*** document that it considered all relevant factors," including "indicators of probable vendor performance under the contract such as past vendor performance," to ensure it receives "the best value." TEX. GOV'T CODE §§ 2155.144(c)-(d) (emphasis added) (App.Tab.2). "'Shall' imposes a duty," *id.* § 311.016(2), and agency leadership understood the statutory requirements were mandatory. Jimmy Ramirez, HHSC's Director of Major Procurement, Medicaid Division, and HHSC's designated point person for the procurement, 5.RR.202; 6.RR.121,confirmed past performance is a "relevant factor," 5.RR.225-27, triggering the statutory duty to consider and document it, 5.RR.227. But the agency did neither.

---

[6]    Molina contends the courts are powerless to prevent the violations of law found by the trial court. Molina.Br.26-35. Though Molina suggests "[t]his reality does not mean HHSC and Commissioner Young are free to violate the cited procurement standards," *id.* at 28, it fails to identify any other manner of judicial recourse. The *ultra vires* doctrine exists precisely for occasions like this, to ensure that state officials follow the law.

The complete omission of past performance from HHSC's scoring process clearly evidences the Commissioner's decision to ignore this factor. In fact, Mercer—the agency's outside consultant on designing the procurement—recommended placing past performance on the scoring sheet as a separate category with independent scoring weight, 5.RR.181; 9.RR.PX.114, but the agency rejected the recommendation, 5.RR.181, 254-55.[7] Moreover, the agency neither instructed evaluators to consider these statutory requirements nor included them in evaluator training materials. 5.RR.233. The Commissioner thus ensured past performance would *not* be considered—the opposite of her statutory mandate.

Nor was past performance documented as Section 2155.44 requires. Mr. Ramirez admitted it "was not an express and independent consideration in this procurement" and "there is no specific documentation showing the agency's consideration of relevant factors including past performance." 5.RR.227-28. He further admitted evaluators were instructed to consider how bidders would perform

---

[7]     The Commissioner tries to spin this evidence in her favor, suggesting her rejection of Mercer's recommendation constituted an exercise of "judgment and deliberation" for which no *ultra vires* claim can lie. Commissioner.Br.21-22. But she misses the point. The Children's Plans do not contend the Commissioner was required to accept Mercer's recommendation about *how* to consider past performance. Rather, they argue her rejection of that recommendation is further evidence she chose not to consider past performance *at all*, which she did *not* have discretion to do under Section 2155.144(c).

17

in the future and did ***not*** "document anything about what [respondents] have done in the past or are presently doing." 5.RR.230.

The Commissioner's refusal to consider and document past performance might have stemmed from a misunderstanding of HHSC's statutory requirements. When asked by legislators whether "past performance [is] part of your measurement," in this procurement, the Commissioner responded no, telling the Legislature she credited bidder's promises of ***future*** performance—"how … an organization is going to fulfill [] quality requirements" but not a bidder's "current metrics" or prior track record. CR.57. At the same hearing, Kay Molina, HHSC's Deputy Executive Commissioner for Procurement and Contracting Services, confirmed the agency's belief that "[s]tate law … doesn't really provide for" the consideration of past performance. CR.60; 9.RR.PX.161 at 113.

Confronted with overwhelming evidence she did not comply with the statute, the Commissioner deploys a legal feint, arguing that Section 2155.144(d) cannot support an *ultra vires* claim because it "does not require consideration of ***every*** enumerated factor" and "vests 'absolute discretion' in the Commissioner to weigh and apply the factors." Commissioner.Br.20 (quoting *Hall v. McRaven*, 508 S.W.3d 232, 241 (Tex. 2017)). But she cannot avoid the plain statutory text or the sworn testimony of Mr. Ramirez. While Section 2155.144(d) states HHSC "***may*** consider all relevant factors in determining the best value, including" the enumerated factors,

18

Section 2155.144(c) directs that "[t]he agency *shall* document that it considered *all* relevant factors under Subsection (d)." TEX. GOV'T CODE § 2155.144(c)-(d) (emphasis added). Thus, while not all enumerated factors may be relevant in every procurement, those that are relevant *must* be considered. For this procurement, Mr. Ramirez confirmed that bidders' past performance is highly relevant and the Commissioner is required to consider and document past performance. 5.RR.225-28. Yet neither she nor anyone else at HHSC did so. 5.RR.227-30.

The Commissioner also attempts to rewrite the record, claiming Mr. Ramirez "testified that past performance *was* documented in the procurement file." Commissioner.Br.21 (emphasis added). But the cited testimony does not support this contention. Mr. Ramirez merely claimed *the entire procurement file* somehow constitutes "documentation showing the agency's consideration of relevant factors including past performance" and yet, in the same breath, he agreed the file did *not* demonstrate the Commissioner's compliance. 5.RR.227. Ms. Molina testified likewise, emptily asserting that "if past performance was [in the response], it was considered." 5.RR.110. Together, the only evidence they offer of the agency's consideration and documentation of past performance is their own *ipse dixit*, contradicting documents and testimony (including Ms. Molina's own representations to the Legislature) showing the opposite. To the extent their say-so is any evidence of the Commissioner's compliance with this statutory directive, it is

19

not remotely conclusive, as she must show for reversal. *See Miranda*, 133 S.W.3d at 227-28.

### 2. The Commissioner has failed to consider provider networks and quality initiatives.

The Commissioner has also disregarded Texas Government Code §§ 533.003(a)(1) and 536.052(d)'s mandates restricting her authority to conduct the procurement.

*First*, the Commissioner "***shall*** give preference to organizations that have significant participation in [their] provider network[s] from each health care provider in the region who has traditionally provided care to Medicaid and charity care patients." TEX. GOV'T CODE § 533.003(a)(1) (emphasis added) (App.Tab.3). But the evidence establishes the Commissioner did not consider (much less apply) this preference even though she recognized it was mandatory. 5.RR.91. The preference was ***not*** reflected on the scoring sheets, 5.RR.94-95; the agency did ***not*** train or instruct evaluators to apply the preference, 5.RR.88-89; and the agency did ***not*** consider network data it already possessed, 5.RR.93-94.

The Commissioner neither disputes this evidence nor contends she satisfied Section 533.003(a)(1). Instead, she points to ***other*** terms in the statute that, she claims, afford her discretion. *See* Commissioner.Br.26; *see also* Aetna.Br.28. These terms at best indicate she has discretion in ***how*** she applies the preference. But the issue here is whether she applied it ***at all***, and there is no evidence she did. The

20

Commissioner cannot substitute the mandatory "shall" with the flexibility of "how."[8]

*Second*, Section 536.052(d) states the Commissioner "***shall*** give preference to an organization that offers a managed care plan that successfully implements quality initiatives … or meets quality of care and cost-efficiency benchmarks." TEX. GOV'T CODE § 536.052(d) (emphasis added) (App.Tab.4). Again, this didn't happen. The Commissioner admits ***she never developed the required benchmarks***. 6.RR.44; *see also* 5.RR.101, 197, 224. Nor did she include this preference on the scoring sheet, 5.RR.104-05; train or instruct the evaluators to give such preference, 5.RR.103-04; or consider data HHSC already possessed, 6.RR.43-44. Once again, the evidence establishes the Commissioner erred by failing to apply Section 536.052(d) ***at all***.[9]

The Commissioner disagrees, broadly asserting Section 2155.144(n) allows her to disregard any statutory criteria other than "best value." Commissioner.Br.24.

---

[8] This is true even if, as Aetna (but not the Commissioner) suggests, the provider-network requirement no longer "retain[s] practical significance." Aetna.Br.30. The Legislature did not give the Commissioner the prerogative to disregard mandatory considerations on this or any other basis.

[9] The Commissioner and Aetna claim Technical Question 13 is evidence this preference was given. Commissioner.Br.29, Aetna.Br.33. But that question merely asked about respondents' "strategies and initiatives" for quality improvement and performance evaluation, 9.RR.PX.38 at 38—in other words, what respondents ***want*** or ***plan*** to do going forward, Aetna.Br.35-36 (quoting responses to Technical Question 13 that illustrate this aspirational focus)—not what quality initiatives they had already implemented.

21

This is *post hoc* revisionism of the highest order. Nothing in the record suggests the Commissioner or anyone else disregarded Section 533.003(a)(1) or 536.052(d) because of a "conflict" with Section 2155.144, TEX. GOV'T CODE § 2155.144(n) ("***To the extent of any conflict***, this section prevails over any other state law relating to the procurement of goods and services[.]" (emphasis added)), nor does the Commissioner explain what such a "conflict" might have been. And even if such a conflict had existed, that would still not have given the Commissioner license to disregard quality initiatives. Section 2155.144 *itself* requires consideration and documentation of "the quality and reliability of the [bidder's] … services" and, as discussed above, "indicators of probable [] performance under the contract such as past [] performance." TEX. GOV'T CODE §§ 2155.144(c), (d)(3), (d)(5) (App.Tab.2).

Further underscoring the Commissioner's *ex post* reinvention is her argument that "[o]nly if two bidders offer the ***same*** value would these preferences even need to come into play." Commissioner.Br.24 (emphasis added). Nothing in the statute's text supports her interpretation, and the record shows HHSC construed this requirement the same way the Children's Plans do:

> Q.  Now, Ms. Molina, would you agree with me that one common and ordinary meaning of preference would be choosing one thing over another?

> A.  That's one way you could define preference.

> Q.  But that's not how HHSC applied preference as used in Section 533.003 in the STAR and CHIP procurement, is it?

22

A.　No. …

Q.　Now, in applying preferences used in Section 62.155(c), the agency here applied the term "preference" to mean choosing one type of respondent over another; correct?

A.　Yes.

Q.　And that was different than how HHSC applied the term "preference" in 533.003 and 536.052; correct?

A.　Yes.

5.RR.93, 119. Even if the Commissioner's (erroneous) view of the law had been to apply these statutory preferences only as tie-breakers, Ms. Molina made clear that HHSC *did not* apply them in this way. And, as the record shows, HHSC did not even evaluate or consider the information required to do so.

As a parting shot, the Commissioner blames the procurement's shortcomings on the bidders themselves, suggesting they should have submitted critical information even if HHSC didn't solicit it. Commissioner.Br.25. But again, there is no evidence the Commissioner actually applied the required preference, regardless of whether bidders submitted relevant information. And, in any event, the procurement was not styled as an open-ended exercise that afforded bidders unfettered discretion and unlimited opportunity to provide every piece of information conceivably relevant to their bids. Specific questions were asked, tight page limits were imposed, and bidders were directed to respond *only* to the Technical Questions and not provide any other materials. 5.RR.84-85, 96-97; 7.RR.18, 88-89;

23

9.RR.PX.38. In the end, *the Commissioner* failed to evaluate the information collected or already in her possession and to instruct the procurement evaluators to award extra points for the required considerations and preferences. She can't pass the buck.

3. **The Commissioner has not evaluated and certified the bidders.**

Section 533.0035(a) states the Commissioner "*shall* evaluate and certify that [MCOs are] reasonably able to fulfill the terms of the contract, including all requirements of applicable federal and state law." TEX. GOV'T CODE § 533.0035(a) (emphasis added) (App.Tab.5). That didn't happen either. HHSC's witnesses admitted the agency allowed bidders to self-certify and did not verify or evaluate those self-certifications. 5.RR.272-74. There was no evaluation and certification *at all*—HHSC merely rubber-stamped documents prepared by the bidders. Par for the course, the Commissioner relies on her purported discretion, suggesting no violation could have occurred because "[t]he statute does not specify the content or extent of evaluation, leaving this to the agency's discretion." Commissioner.Br.36. But again, the issue is not *how* but *whether* she undertook that duty—and she did not.

4. **The Commissioner is not promoting continuity of care or reducing administrative and nonfinancial barriers.**

Section 533.002 further states the Commissioner "*shall* implement the Medicaid managed care program by contracting with managed care organizations in

24

a manner that, to the extent possible[,] … promot[es] continuity of care" and "reduces administrative and other nonfinancial barriers for recipients in obtaining health care services." TEX. GOV'T CODE § 533.002 (emphasis added) (App.Tab.6). HHSC officials nevertheless testified they affirmatively decided *not* to consider the 1.5 million-plus Texans who would need to switch health plans—and possibly healthcare providers as well. 5.RR.190; 6.RR.97-98; 7.RR.38-40.

The Commissioner meritlessly suggests "designing the managed care program as a whole" and "offering different product lines" satisfies this imperative. Commissioner.Br.37. But offering various "product lines" (like HMOs or PPOs) does *not* ensure continuity of care for children and pregnant women forced to change health plans. Nor does a "readiness review" *following* the award of contracts ensure continuity of care for the more than 1.5 million Texans who will be forced to change health plans. *Contra id.*; Aetna.Br.48-52. Indeed, many will undoubtedly suffer from disruptions in their care. *Infra* at 53-56.

5. **The Commissioner has not considered different plans for different populations.**

Section 533.003(a)(3) provides the Commissioner "*shall* consider the need to use different managed care plans to meet the needs of different populations." TEX. GOV'T CODE § 533.003(a)(3) (emphasis added) (App.Tab.3). HHSC officials

conceded she did not fulfill this requirement because she did not consider how contract awards would impact different populations. 5.RR.166; 6.RR.64-66, 93-96.[10]

In response, the Commissioner argues only that she "has noticed an intent to award contracts to different organizations in different [service areas]." Commissioner.Br.29. But "different populations" under Section 533.003(a)(3) *cannot* in practice refer to STAR & CHIP members in different regions, as Mr. Ramirez testified that HHSC does not recognize differences among members based on service areas. *See* 6.RR.66 ("Q. So if they meet the requirements for STAR/CHIP … then a member is a member is a member is a member? A. Yes."). Moreover, if the Legislature had intended "different populations" to refer to different geographic regions, it could have used the term "regions" in Section 533.003(a)(3) rather than "populations." After all, the term "region" has a specific meaning in this context. *See* TEX. GOV'T CODE § 533.001(7) ("[h]ealth care service region" or "region" means "a Medicaid managed care service area as delineated by the commission") (App.Tab.7). But it didn't. *See, e.g.*, *Union Carbide Corp. v. Synatzske*, 438 S.W.3d

---

[10]     Aetna introduces yet another strawman, claiming the Children's Plans "conten[d] that HHSC should have phrased the questions differently" to seek information about different populations. Aetna.Br.57. Not so. While the Commissioner's failure to solicit relevant information reflects her failure to consider certain criteria, it is the Commissioner's disregard of mandatory considerations like Section 533.003(a) that underlies the *ultra vires* claims.

39, 52 (Tex. 2014) ("We take statutes as we find them, presuming the Legislature included words that it intended to include and omitted words it intended to omit.").

At any rate, even if "different populations" means what the Commissioner says, she still failed to comply with the statute because, she did nothing to ensure the use of different MCOs to meet the needs of different populations. After all, she did not assign MCOs to specific service areas but instead allowed each winning bidder to choose its *own* service areas, CR.3519-22; 5.RR.76-78; 9.PX.38 at 17-18, 29-30, irrespective of whether they are well-suited to those areas.

### 6. The Commissioner intends to award "mandatory" CHIP contracts.

Although Medicaid programs like STAR are subject to mandatory contracting requirements, TEX. GOV'T CODE §§ 2155.44, 533.004 (App.Tab.8), these mandates do not apply to *non*-Medicaid programs like CHIP, TEX. HEALTH & SAFETY CODE § 62.155 (App.Tab.9). HHSC executives nevertheless confirmed their intention to award "mandatory" CHIP contracts. 5.RR.111, 118; 6.RR.50, 59. The Commissioner's brief once again misconstrues the Children's Plans claims. The issue is not whether "CHIP and STAR services can[] be procured in the same RFP" or whether tandem awards are "consistent with [] best-value scoring," Commissioner.Br.37-38, but rather whether *mandatory* CHIP contracts can be awarded. They cannot. *Cf.* TEX. HEALTH & SAFETY CODE § 62.155(c)(1) (providing that Commissioner may only "give *preference* to a person who provides similar

27

coverage under the Medicaid program," not mandatory contract (emphasis added));

*see also City of Corpus Christi v. Pub. Util. Comm'n*, 188 S.W.3d 681, 690 (Tex. App.—Austin 2003, pet. denied) ("[A]n agency may not, in the guise of implied powers, exercise what is effectively a new power, or a power contrary to a statute, on the theory that such exercise is expedient for the agency's purpose, nor may it contravene specific statutory language[.]" (citation omitted)).

### 7. The Commissioner's improper disclosure to Aetna tainted the entire procurement.

Texas law requires HHSC to conduct procurements in a fair and consistent manner. *See* 1 TEX. ADMIN. CODE §§ 391.101(2) (App.Tab.10), 391.209(3)(A) (App.Tab.11). It also generally prohibits agencies from "disclos[ing] information derived from proposals … to any competing respondent prior to award or cancellation of [a] solicitation." 34 TEX. ADMIN. CODE § 20.208(d)(3) (App.Tab.12). But HHSC executives acknowledged that other bidders' proposals were improperly leaked to Aetna—one of the top-scoring bidders—while the procurement was ongoing (specifically, before Aetna's oral presentation). 5.RR.137-40. This wrongful disclosure undermined the procurement's integrity because Aetna got a sneak peek at competitive information that was not provided to other bidders. 6.RR.15-17.

The Commissioner attempts to defend the wrongful disclosure by hiding behind the Public Information Act ("PIA"), which, she argues, compelled her to release the information and trumps any procurement regulation.

28

Commissioner.Br.32-34. This position is surprising. The Children's Plans are currently engaged in separate PIA lawsuits in which the Commissioner has argued that, even as of 2024, analogous documents—including those HHSC unlawfully released to Aetna—***cannot*** be released under the PIA because it would harm competitive interests. *See* TEX. GOV'T CODE § 552.104(a) (App.Tab.13); CR.2979. The Attorney General has agreed with this position. *See* Tex. Att'y Gen. Open Recs. Letter Ruling OR2023-034773 (App.Tab.14); Tex. Att'y Gen. Open Recs. Letter Ruling OR2024-018260 (App.Tab.15); Tex. Att'y Gen. Open Recs. Letter Ruling OR2024-019071 (App.Tab.16). This argument is yet another attempt at *post hoc* revision the Court should reject.[11]

Furthermore, while the Commissioner accuses the Children's Plans of "*ipse dixit*" in claiming the unlawful disclosure tainted the procurement's results, Commissioner.Br.34, the evidence she cites to the contrary is itself unsubstantiated, *see* 9.RR.157 at 7 (conclusory statement from Ms. Molina that "no violation … has occurred that affected the integrity of the solicitation or the resulting contract awards"). And Ms. Molina conceded at the evidentiary hearing that she does not

---

[11] The Commissioner also argues she did not violate Texas law because she did not "disclose[] information ***derived from*** proposals," Commissioner.Br.33 (quoting 34 TEX. ADMIN. CODE § 20.208(d)(3))—seemingly proposing a meaningful distinction between the ***proposals themselves*** and isolated information derived from them. That makes no sense. Increasing the magnitude of harm (by disclosing not only derived information but ***the entire proposals***) does not somehow limit the severity of the offense. It only magnifies the problem.

know whether and how Aetna used the wrongfully disclosed materials or whether any prejudice resulted. 5.RR.147-49.

**B.    The Commissioner's other jurisdictional arguments rely on mischaracterizations of the Children's Plans' *ultra vires* claims.**

Throughout her brief, the Commissioner (like Molina and Aetna) mischaracterizes the Children's Plans' claims, the relief they seek, and the contours of the *ultra vires* doctrine. Consequently, the briefing before the Court is largely directed at strawman arguments that distract rather than illuminate.

**1.    The Children's Plans have standing.**

The Children's Plans have standing because they have shown (1) a concrete and particularized injury (business disruption and probable dissolution) (2) that is fairly traceable to the defendant's conduct (an unlawful procurement) and (3) redressable by the relief sought (an injunction to prevent the procurement's further implementation). *See Data Foundry, Inc. v. City of Austin*, 620 S.W.3d 692, 696 (Tex. 2021). The Commissioner does not argue that any of these factors have not been met. Rather, her challenge depends on mischaracterizing the Children's Plans' claims as seeking retrospective relief—setting aside the procurement. Commissioner.Br.23-25. But the Children's Plans seek *only* prospective relief to halt the Commissioner from the continued unlawful implementation of the procurement. They do ***not*** seek to dictate how the Commissioner remedies that illegality.

30

The Commissioner's reliance on standing analysis from federal bid-protest cases is thus misplaced, but that authority nevertheless cuts against her. In some bid-protest cases—say, where a challenge addresses an isolated scoring issue—a protesting party might, as the Commissioner contends, lack standing because the error could not have affected the procurement's outcome or "caused [the protestor] to be passed over." *Id.* at 23. But in a more comprehensive challenge to a procurement like this one, "a bid protester has standing when, assuming its protest is successful, it would have an opportunity to participate in a new procurement." *VAS Realty, LLC v. United States*, 26 F.4th 945, 949 (Fed. Cir. 2022); *see also, e.g.*, *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015) (bid protester can establish standing "by showing that it was an actual or prospective bidder whose direct economic interest would be affected by the award of the contract or by failure to award the contract"). Likewise, bidders for government contracts who allege endemic illegality have standing to seek "forward-looking relief" if they plan to bid on future contracts that would contain the same challenged infirmity. *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 210-11 (1995). Even if this were the applicable standard, the Children's Plans met it by

31

demonstrating (as the trial court found) pervasive statutory and regulatory violations infecting the *entire* procurement, thus rendering the results unlawful.[12]

While helpful to the Children's Plans, this standing analysis is ultimately irrelevant. Whether a "clear and prejudicial" violation must be shown to "set aside a procurement decision," Commissioner.Br.23 (quoting *Elcon Enters., Inc. v. Wash. Metro. Area Transit Auth.*, 977 F.2d 1472, 1478 (D.C. Cir. 1992)), is immaterial here because the Children's Plans do not request that relief. Instead, they seek to enjoin *future* unlawful acts by the Commissioner that would perpetuate the unlawful acts that have already occurred. The Commissioner does not and cannot suggest the Children's Plans lack standing to secure prospective relief given the injuries inflicted on them by the unlawful procurement and their intention to participate in future procurements (including the pending STAR Kids procurement). *Infra* at 50-52; *see also, e.g.*, *Lazarides v. Farris*, 367 S.W.3d 788, 801 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (applying, in *ultra vires* context, "general rule [that], to have

---

[12]    That the plaintiff MCO in *Wilson v. Community Health Choice Texas, Inc.*, 607 S.W.3d 843 (Tex. App.—Austin 2020, pet. denied) was able to point to a single dispositive error in that procurement as "the only entity qualifying for a mandatory contract award," Commissioner.Resp.23, was merely a factual quirk—not a bright-line prerequisite for seeking prospective relief in a procurement challenge.

standing[,] an individual must demonstrate a particularized interest in a conflict distinct from that sustained by the public at large").[13]

## 2. The Children's Plans' claims are ripe.

The Commissioner erroneously contends that the Children's Plans' *ultra vires* claims are not ripe because she could still decide their bid-protest appeals in their favor. Commissioner.Br.11-14; *see also* Aetna.Br.9-14; Molina.Br.52-54. However, the theoretical possibility she might suddenly reverse course, disavow all her prior briefing in this case, and grant the appeals does not affect whether their *ultra vires* claims are ripe now. In determining ripeness, "courts must consider whether, at the time a lawsuit is filed, the facts are sufficiently developed so that an injury ***has occurred or is likely to occur***, rather than being contingent or remote." *Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69, 78 (Tex. 2015) (emphasis added). Here, the record shows both.

*First*, injury has ***already occurred*** in the form of disruptions to the Children's Plans' businesses, loss of staff, and difficulty filling positions caused by the uncertainty of whether the Commissioner will implement the notice of intent to

---

[13] Relatedly, Molina—but not the Commissioner—argues the Children's Plans lack contractual rights and, "[w]ith no rights at stake," they "may not invoke the ultra vires exception to sovereign immunity." Molina.Br.17. But any lack of contractual "rights" is irrelevant. The basis for the Children's Plans' *ultra vires* claims is not a contractual right but "a private party's rights against a state official who has acted without legal or statutory authority." *Heinrich*, 284 S.W.3d at 368. The Children's Plans' standing grants them sufficient interest to assert their *ultra vires* claims.

award the STAR & CHIP contracts. *Infra* at 50-52. That harm, by itself, is sufficient to establish that the Children's Plans' claims are ripe. *See Abbott v. Doe*, 691 S.W.3d 55, 75-76 (Tex. App.—Austin 2024, no pet.) (*ultra vires* claims were ripe and did not require final agency determination where parties had already experienced harm).

*Second*, the Commissioner's actions illustrate that additional harm is likely to occur because she will deny the Children's Plans' bid-protest appeals. The Commissioner conceded that she signed off on a February 2024 action memo requesting her approval to issue the notice of intent to award despite knowing it would eliminate the Children's Plans. 6.RR.140; 12.RR.PX.284. She even testified, that "I actually wanted to try to find a way to add them back in, but I couldn't—I couldn't come up with a principled way to do it[.]" 6.RR.141. Moreover, the challenges to the procurement's legality in the Children's Plans' bid-protest appeals mirror the challenges the trial court sustained in the temporary injunction, which the Commissioner contested below and continues to vigorously oppose in this appeal. *Compare, e.g.*, CR.5793-827 (Texas Children's bid-protest appeal), *and* CR.5877-79 (rulings in temporary injunction sustaining challenges to procurement's legality), *with* Commissioner.Br.17-38. The Commissioner's opposition to the Health Plans' request for more time to file their response briefs in this appeal erases any doubt that she intends to deny the bid protest appeals: She justified her opposition on the ground that the Health Plans should not receive any further payments "for contracts ***they did***

34

*not win*" and "to which they ha[ve] *no entitlement*." Commissioner.Resp.2nd.MFET.2 (emphasis added) (describing the Health Plans' case as "meritless").[14]

This evidence of both prior and impending injury is more than sufficient to establish the ripeness of the Children's Plans' *ultra vires* claims. *See, e.g.*, *City of Houston v. Norcini*, 317 S.W.3d 287, 291 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (in reviewing ripeness challenge, court "must take as true all evidence favorable to the plaintiff and indulge every reasonable inference and resolve any doubts in [plaintiff's] favor" (citation modified)).

The Commissioner also contends that, "[w]hen a plaintiff alleges that an agency has incorrectly applied the law governing the subject of its dispute, that claim is not ripe if the plaintiff has not availed himself of the available recourse under that law." Commissioner.Br.15 (citing *Riner v. City of Hunters Creek*, 403 S.W.3d 919, 923-24 (Tex. App.—Houston [14th Dist.] 2023, no pet.); *Marble Falls ISD v. Scott*, 275 S.W.3d 558, 567 (Tex. App.—Austin 2008, pet. denied)). The cited cases are readily distinguishable because they did not involve *ultra vires* claims, which do not require exhaustion of any relevant administrative remedies. *Infra* at 37-40. Indeed,

---

[14]    The Commissioner argues that the Court must presume she will consider the bid-protest appeals in good faith. Commissioner.Br.13-14; Aetna.Br.14. Any such presumption has been conclusively rebutted by her filings in this Court unequivocally arguing the procurement was lawfully conducted.

the very nature of *ultra vires* claims demonstrates why the Children's Plans' claims are ripe. Forcing the Children's Plans to wait for her decision on their bid-protest appeals would allow the Commissioner to ink contracts with the intended MCOs before the Children's Plans could stop her—***which she testified she would do***.[15] *Ultra vires* claims brought at that point would be open to challenge on both mootness and immunity grounds, since rescinding executed contracts might be construed as improperly retrospective relief. *See Heinrich*, 284 S.W.3d at 369 (limiting *ultra vires* claims to equitable prospective relief).

These concerns are not merely hypothetical, as the Commissioner's predecessor took similar steps and made similar arguments during an earlier procurement challenge. In *Wilson v. Community Health Choice Texas, Inc.*, a prior commissioner "executed and officially awarded" the announced procurement contracts in the midst of *ultra vires* litigation challenging that procurement—and then argued the contract execution rendered the case moot. 607 S.W.3d 843, 848 (Tex. App.—Austin 2020, pet. denied). The Commissioner might attempt the same gambit here.

---

[15]    *See* 6.RR.132 ("[A. O]nce that [bid protest] is finished, then I would move forward."); 6.RR.147 ("Q. And if you were to deny those appeals, then you could execute the contracts immediately at any time after denying those appeals; right? A. Yes, ma'am."); *id*. ("Q. But there wouldn't be any waiting period or time period. You could execute the contracts immediately after denying the appeals? A. Yes, that's correct[.]").

Ultimately, "[r]ipeness concerns not only whether a court *can act*—whether it has jurisdiction—but prudentially, whether it *should*." *Perry v. Del Rio*, 66 S.W.3d 239, 249-50 (Tex. 2001) ("In assessing ripeness, … a court is required to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." (citation modified)). And here, the Court not only can act but should. The Commissioner has given every indication that she will deny the Children's Plans' bid-protest appeals and sign the contracts in question immediately thereafter, resulting in catastrophic harm to the Children's Plans and their members—thus justifying judicial action to preserve the status quo while this suit is litigated on the merits.

### 3. The exhaustion-of-remedies doctrine does not apply.

Relatedly, the Commissioner, Aetna, and Molina erroneously argue the Children's Plans cannot bring their *ultra vires* claims unless and until the Commissioner first decides the bid-protest appeals. Commissioner.Br.14-16; Aetna.Br.9-14; Molina.Br.52-54. Texas law, however, does not require a plaintiff to exhaust administrative remedies before filing *ultra vires* claims. *See, e.g.*, *Kilgore ISD v. Axberg*, 535 S.W.3d 21, 34 (Tex. App.—Texarkana 2017, no pet.) (noting that "there are exceptions to the exhaustion-of-remedies doctrine," including "when an administrative agency purports to act outside its statutory powers"); *Brennan v. City of Willow Park*, 376 S.W.3d 910, 921-22 (Tex. App.—Fort Worth 2012, pet.

denied) (parties were not required to pursue any type of protest procedure where they alleged agency acted outside its statutory powers); *Smith v. Abbott*, 311 S.W.3d 62, 80 (Tex. App.—Austin 2010, pet. denied) (noting that "administrative exhaustion is not required" where declaratory judgment claims "allege acts *ultra vires* of [defendant's] statutory authority" (citing *Westheimer ISD v. Brockette*, 567 S.W.2d 780, 789 (Tex. 1978))). The Commissioner cites no authority to the contrary.[16]

This makes sense. Requiring exhaustion of administrative remedies would be fundamentally incompatible with the *ultra vires* cause of action, which is limited to **prospective** relief and is not a review of a final agency decision. Moreover, *ultra vires* claims are common-law claims, and exhaustion is not a general precondition to suit in district court absent a statute establishing an exhaustion requirement. *See Cash Am. Int'l Inc. v. Bennett*, 35 S.W.3d 12, 15 (Tex. 2000) ("***When exhaustion is required***, courts may review the administrative action only at the time and in the manner designated by statute." (emphasis added)). "A Texas district court … is a

---

[16] The cases cited by the Commissioner and Molina, *see* Commissioner.Br.14; Molina.Br.53, are inapposite because they did not involve *ultra vires* claims. Molina also undermines its own argument by citing *Janek v. Gonzalez*, where the Third Court ***expressly recognized*** "the ultra-vires exception to the doctrine of sovereign immunity and to the exhaustion requirement." No. 03-11-00113-CV, 2013 WL 1748795, at *9 (Tex. App.—Austin Apr. 17, 2013, no pet.). This exception did not help the *Janek* plaintiff because he failed to plead proper *ultra vires* claims, *id.* at *7-9, whereas the Children's Plans have done so here, *supra* at 14-30.

court of general jurisdiction," and "the presumption is that [such courts] have subject matter jurisdiction unless a showing can be made to the contrary." *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 75 (Tex. 2000). "Thus, all claims are presumed to fall within the[ir] jurisdiction … unless the Legislature or Congress has provided that they must be heard elsewhere." *Id*. (citation modified). "Something unmistakable must be present to displace the strong presumption of jurisdiction" and, "[a]bsent a compelling showing to the contrary," it is "presume[d] that … the jurisdiction of a district court—our state's sole court of general jurisdiction—remains undisturbed." *S.C. v. M.B.*, 650 S.W.3d 428, 436, 444 (Tex. 2022).

As an exception to this "strong presumption," exhaustion applies only where the Legislature has made it a prerequisite to jurisdiction. The most prominent examples are review of administrative decisions under the Administrative Procedure Act ("APA"), *see, e.g.*, *Tex. Dep't of Protective & Regul. Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 173 (Tex. 2004), and where an agency is assigned exclusive jurisdiction, *see, e.g.*, *In re Oncor Elec. Delivery Co.*, 630 S.W.3d 40, 44-45 (Tex. 2021) (orig. proceeding). No such exception applies here, and the Commissioner cites none.

*First*, disputes that fall under HHSC's procurement regulations are specifically carved out of the APA because bid protests (and any internal appeals) are not defined as "contested cases" under the APA. *See* 1 TEX. ADMIN. CODE

§ 391.303(d) ("HHSC will not consider protests filed pursuant to this subchapter as contested cases under the [APA].") (App.Tab.17).

*Second*, because it is presumed that a district court has subject-matter jurisdiction, "the burden to demonstrate that exclusive jurisdiction rests with an administrative agency falls on the party resisting the district court's jurisdiction." *Oncor Elec.*, 630 S.W.3d at 44-45.[17] The Commissioner does not meet that burden. She identifies no statute that expressly or impliedly removes these *ultra vires* claims from the trial court's general jurisdiction, and she cannot impose an exhaustion requirement where none exists.[18]

### 4. The Children's Plans properly sued the Commissioner.

Aetna claims the Children's Plans improperly sued the Commissioner because she did not directly engage in earlier conduct such as designing the procurement or

---

[17] The Commissioner claims that, "when an available administrative remedy 'may moot the claim … the claim is barred.'" Commissioner.Br.14-15 (quoting *Hensley v. State Comm'n on Jud. Conduct*, 692 S.W.3d 184, 194 (Tex. 2024)). *Hensley*, however, hurts the Commissioner more than it helps because the Supreme Court held that the exhaustion-of-remedies doctrine **did not** bar the plaintiff's *ultra vires* claim. *See* 692 S.W.3d at 198.

[18] Even if exhaustion were required here (which it is not), "[f]utility is a recognized exception to the exhaustion of administrative remedies." *Ogletree v. Glen Rose ISD,* 314 S.W.3d 450, 454 (Tex. App.—Waco 2010, pet. denied). Under this exception, a party "must show that it is certain that the claim will be denied on appeal," *id.*, and as shown above, *supra* at 34-37, the Commissioner's own testimony and full-throated opposition to the merits of Plaintiffs' *ultra vires* claims render her denial of the bid-protest appeals a foregone conclusion.

40

scoring the bids. Aetna.Br.14-19. Tellingly, only Aetna—not the Commissioner—makes this argument, which is based on a fundamental misunderstanding of not only *ultra vires* claims generally but also the prospective relief the Children's Plans seek.

In *Heinrich*, the Supreme Court directly addressed the proper parties in *ultra vires* actions, noting that "a judgment against a public servant in his official capacity imposes liability on the entity that he **represents**" and "a suit against a state official is merely another way of pleading an action against the entity of which [the official] is an agent." 284 S.W.3d at 373 (citation modified and emphasis added). The Children's Plans seek only prospective relief, and the only person left to act is the Commissioner. The Children's Plans' *ultra vires* claims do not seek relief regarding past procurement conduct undertaken by other HHSC personnel. Instead, they seek to enjoin the Commissioner's rejection of their bid-protest appeals and execution of contracts with the presumptive awardees. *See* CR.5883 (enjoining the Commissioner from "awarding, signing, entering into, executing, implementing, or otherwise taking action to effectuate or perform any contracts resulting from or in connection with the STAR & CHIP RFP or to further the procurement or contracting processes for the STAR & CHIP RFP"). Such conduct falls within **the Commissioner's** purview, not her subordinates'. *See Hall*, 508 S.W.3d at 239 (*ultra vires* doctrine requires "pinpointing which official has the duty to act"); TEX. GOV'T CODE § 524.0002(b)(4) (granting Commissioner authority over and responsibility for

"contracting, purchasing, and related policies") (App.Tab.18); 1 TEX. ADMIN. CODE § 391.307(d) ("A decision issued in writing by the HHSC Executive Commissioner shall be the final administrative action of HHSC on a protest determination that is appealed under this subchapter.") (App.Tab.19).

In sum, unlike *Hall*—where a plaintiff sued "a nominal, apex representative who ha[d] nothing to do with the allegedly *ultra vires* actions"—the Children's Plans properly sued the Commissioner "to compel [her] to follow [her] governing authority," and their claims are "confined to conduct pursuant to [her] authority." 508 S.W.3d at 240 (emphasis omitted).

### 5. The Commissioner's authority is limited by statutory criteria and requirements.

The Commissioner asserts that her authority over a $120 billion procurement is virtually absolute. Commissioner.Br.17-18; *see also* Molina.Br.35-52. But she ignores the express limits on her authority in the very statutes that enable her to conduct the procurement. As discussed above, *supra* at 14-15, *Houston Belt* contrasted absolute and limited discretion, explaining that "government officers charged with administration can[not] perform their duties 'in conflict with the plain language of [their enabling] statute' whenever they might please with no threat of judicial review." 487 S.W.3d at 163 (second alteration in original) (quoting *Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 9 (2015)). The statutes and regulations requiring the Commissioner to apply mandatory considerations clearly

limit the absolute discretion she erroneously claims to possess in determining "best value" under Section 2155.144. *See Wilson*, 607 S.W.3d at 846-47 (stating that HHSC must comply with Section 2155 *and*, "[i]n addition to adhering to those general requirements, [] must implement the Medicaid managed care program by contracting with MCOs in a manner consistent with chapter 533 of the Government Code"). While she might have some discretion in *how* to apply those requirements, she lacks discretion to wholly ignore them.[19]

Nor, for that matter, does the Commissioner retain the discretion to misinterpret Texas law. *See, e.g.*, *Chambers-Liberty Cntys. Navigation Dist. v. State*, 575 S.W.3d 339, 354 (Tex. 2019) (government officials "do not have discretion to misinterpret state statutes constricting their authority"). This case is not like *Hall*, where the allegedly *ultra vires* act involved an official's interpretation of "federal privacy law—a law *collateral* to [his] authority." 508 S.W.3d at 242. Instead, this case is analogous to *Houston Belt*, where the law "authorizing the [defendant] to act commanded him to make … determination[s]" using a specific methodology and therefore act "subject to explicit constraints"—which he disregarded, thus acting

---

[19]    This reasoning also undermines the Commissioner's attempt to distinguish this case from *Smith*, where the Third Court concluded administrative exhaustion was not required in the *ultra vires* context. *See* 311 S.W.3d at 80. Just as the state agency there "could not delegate its statutory authority to suspend drivers licenses to the State Office of Administrative Hearings because SOAH had no such statutory authority," Commissioner.Br.16, so too does the Commissioner lack statutory authority to undertake procurements while disregarding mandatory considerations.

outside his limited discretion. *Id.* at 241-42. "Neglecting one of those constraints was what made the [the challenged] determination—whether right or wrong—*ultra vires.*" *Id.* at 242. Here, the very laws that empower the Commissioner to award Medicaid contracts similarly include multiple "specific, substantive, [and] objective standards" to guide that process, *Hous. Belt*, 487 S.W.3d at 161—which, the trial court found, the Commissioner disregarded in this procurement. CR.5876-79.[20]

### 6. The Children's Plans do not seek an improper "redo" of the procurement.

Lastly, the Commissioner asserts that the Children's Plans seek a retrospective "redo" remedy for her allegedly unlawful conduct, but she does not and cannot cite any request for such relief in the Children's Plans' pleadings. Commissioner.Br.38-43.[21] There is none. Rather, the Children's Plans seek to enjoin the Commissioner from continuing to engage in unlawful conduct in the ***future***—and that is the

---

[20] While the Children's Plans strenuously disagree with the substantive results of the procurement, that is ***not*** the basis for their *ultra vires* claims. Rather, it is the Commissioner's disregard of mandatory considerations that have rendered and will continue to render the procurement unlawful.

[21] All the Commissioner cites is a declaration by an expert for Superior. Commissioner.Br.31 (citing CR.3279). But that expert merely expressed her ***opinion*** that "[t]he only remedy that can cure" the Commissioner's unlawful disclosure of Superior's proposals to competitors during the procurement—which is just one of the many *ultra vires* acts committed by the Commissioner—"is to cancel the Notice of Intent to Award and to redo the entire process." CR.3279. Whether the Commissioner pursues that course of action is yet to be seen, but redoing the procurement is not relief the Children's Plans have sought.

prospective relief the trial court granted. CR.5876 ("Plaintiffs properly seek only prospective relief—specifically, injunctive relief prohibiting Defendant from awarding, executing, or otherwise implementing the intended RFP contracts and thus preventing further unlawful acts in connection with Defendant's procurement or contracting processes[.]"); CR.5883 (granting prospective relief only).

The Commissioner cites *In re Stetson Renewables Holdings, LLC*, 658 S.W.3d 292, 297 (Tex. 2022) (orig. proceeding), and *Morath v. Kingsville ISD*, 710 S.W.3d 918, 925 (Tex. App. [15th Dist.] 2025, no pet.), in support of her argument. Commissioner Resp.39-41. Both cases are inapposite. Neither held that a ***common-law ultra vires*** claim may be asserted only when the Legislature expressly provides a judicial remedy. Nor did either hold that an *ultra vires* claim must be dismissed unless it seeks a remedy expressly authorized by the statute allegedly violated. The Children's Plans' *ultra vires* claims merely seek to prohibit the Commissioner from further violating established statutory mandates, and the Supreme Court has held such prospective injunctive relief is a proper remedy for *ultra vires* conduct. *See, e.g.*, *Heinrich*, 284 S.W.3d at 368-69 (governmental immunity "does not preclude prospective injunctive remedies in official-capacity suits against government actors who violate statutory … provisions").

The Commissioner further argues (incorrectly) that, when the Children's Plans agreed to the terms of the solicitation by submitting their proposals, they

45

"waived any claim of an ongoing violation of their rights not to be subjected to an unlawful process" and that "[i]t was at that point the nature of any relief the Court could have granted became retrospective for purposes of *ultra vires* law." Commissioner.Resp.41. Both parts of the Commissioner's argument are wrong.

*First*, the Children's Plans' claims are based on their objections to the Commissioner's subsequent **execution** of the procurement—**after** they and the other MCOs submitted their proposals—that violated the Commissioner's guarantee in the solicitation that "[p]roposals shall be **evaluated** in accordance with State law, including but not limited to, applicable provisions of Chapters 533, 536, and 2155 of the Texas Government Code." 9.RR.PX.38 at 21 (emphasis added). The Children's Plans had no reason to think the Commissioner would violate that guarantee. *See* 5.RR.85 (testimony by Ms. Molina that "it was reasonable … for a bidder to—or prospective bidder to understand that the agency would in fact comply with" these statutory provisions); *cf. EIS Dev. II, LLC v. Buena Vista Area Ass'n*, 715 S.W.3d. 689, 699 (Tex. 2025) ("Waiver is an intentional relinquishment of a **known** right or intentional conduct inconsistent with claiming that right." (citation modified and emphasis added)). The Children's Plans, of course, could not have challenged the Commissioner's broken promises before their proposals were even submitted. Consequently, the provision requiring pre-solicitation bid protests to the content of the RFP itself, 9.RR.PX.38, is irrelevant.

46

*Second*, the Commissioner fails to explain how the Children's Plans' alleged waiver of objections to the contents of the solicitation can somehow convert a claim for remedial action as to ***future*** conduct that has not occurred into a claim for ***retrospective*** relief. Based on the definitions of retrospective and prospective relief contained in the very case the Commissioner cites on this point, the Children's Plans' *ultra vires* claims seeking to prohibit the Commissioner from taking further unlawful action—on their face—are not attempts to "remedy past violations" but rather to "compel[] legal compliance going forward." *City of Austin v. Util. Assocs., Inc.*, 517 S.W.3d 300, 309 (Tex. App.—Austin 2017, pet. denied).

\* \* \*

In sum, the Children's Plans do not suggest the Commissioner merely "made a mistake or 'got it wrong'" when making decisions she is "statutorily empowered to make." Commissioner.Br.17 (quoting *Util. Assocs.*, 517 S.W.3d at 310). Instead, they contend, the record confirms, and the trial court ruled that the Commissioner engaged in textbook *ultra vires* conduct by completely disregarding statutory mandates and unlawfully "exercis[ing] discretion without reference to or in conflict with the constraints of the law authorizing [her] to act." *Id.* at 18 (second alteration in original) (quoting *Hall*, 508 S.W.3d at 241). And the Commissioner herself acknowledged on the stand that these violations are ongoing because the procurement is not yet complete, 6.RR.128 ("[Q.] Mr. Ramirez testified earlier that

47

the procurement is ongoing. You would agree with that? A. Yes, sir.")—underscoring that the Children's Plans properly seek prospective relief only.

## II. The trial court did not abuse its discretion in granting a temporary injunction.

"Whether to grant or deny a temporary injunction is within the trial court's sound discretion." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The reviewing court may reverse an order granting a temporary injunction "only if the trial court abused that discretion" and "must not substitute its judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion." *Id.* When the grant of a temporary injunction is based on disputed questions of fact—as in this case—the reviewing court should not disturb the trial court's order if it "is based on conflicting evidence," *Daniel v. Goesl*, 341 S.W.2d 892, 894 (Tex. 1960), and should "draw all legitimate inferences from the evidence in a manner most favorable to the trial court's judgment," *Tanguy v. Laux*, 259 S.W.3d 851, 856 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

As demonstrated above, the record establishes the Commissioner has acted and will continue to act outside the scope of her lawful authority. *Supra* at 16-30. Accordingly, the trial court's ruling that the Children's Plans had a probable right to relief on their *ultra vires* claims was grounded in the evidence and not arbitrary at all—let alone so arbitrary that it exceeded the bounds of reasonable discretion. Nor did the trial court abuse its discretion in ruling that the Children's Plans have suffered

48

and will suffer irreparable harm and that the balance of equities supports a temporary injunction.

### A. The temporary injunction seeks to preserve the status quo by preventing further unlawful conduct by the Commissioner.

At the outset, both the Commissioner and Molina argue the trial court's temporary injunction upsets rather than preserves the status quo, variously claiming the "last actual, peaceable, non-contested status which preceded the pending controversy" was the time before the Commissioner issued the notice of intent to award, Commissioner.Br.45, or that the status quo is the Commissioner's "exercis[e of] her authority" to undertake procurements, Molina.Br.55. Both theories are based on a fundamental misunderstanding of the Children's Plans *ultra vires* claims. The Children's Plans solely seek ***prospective*** relief to prohibit the Commissioner from engaging in further unlawful conduct (like executing new STAR & CHIP contracts with the presumptive awardees). Thus, the status quo the temporary injunction preserves is the current status of the procurement at the time the injunction issued.

What's clear is that the status quo the Children's Plans seek to preserve cannot be the time ***before*** the Commissioner issued the notice of intent to award because their forward-looking *ultra vires* claims do not seek to undo that act. It has already occurred and is beyond the scope of the Children's Plans' requested relief. Nor can the status quo be the mere exercise of the Commissioner's authority, which makes no sense on its face—particularly since that would have required the Children's

49

Plans to seek a temporary injunction before the Commissioner took *any* action in the procurement and before the Children's Plans could have discovered the subsequent unlawful conduct underlying their *ultra vires* claims.

**B.**     **The Children's Plans and their members face imminent, irreparable harm if the temporary injunction is reversed.**

The Commissioner does not and cannot dispute that, if her unlawful conduct is allowed to continue while the Children's Plans *ultra vires* claims are being litigated—for example, if she is allowed to execute new STAR & CHIP contracts with the presumptive awardees—the Children's Plans and their members will suffer the irreparable harm they proved and the trial court found. CR.5879-80.

**1.**     **The continued viability of the Children's Plans is at risk.**

Because the Children's Plans were founded in conjunction with Texas's rollout of Medicaid managed care and CHIP to partner with the State and ensure access to high-quality care for beneficiaries, the STAR & CHIP contracts are the Children's Plans' *raison d'être*. Loss of those contracts thus poses an existential threat to their continued viability because *that is all they do*. 8.RR.35-36, 129-30, 133, 159, 176-77. While the Children's Plans also operate STAR Kids programs, if they lose their much larger STAR & CHIP contracts, then they will lose the vast majority of their Medicaid members and most of their revenue and it is unlikely they will be able to continue their operations. 8.RR.35-36, 39, 159-60. This threat of dissolution justifies injunctive relief. *See, e.g.*, *Frequent Flyer Depot, Inc. v. Am.*

*Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied) ("Disruption to a business can be irreparable harm."); *TrueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp.3d 705, 727 (S.D.N.Y. 2017) ("[M]ajor disruption of a business can be as harmful as termination, and a threat to the continued existence of a business can constitute irreparable injury." (citation modified) (quoting *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993))).

At a minimum, the loss of the STAR & CHIP contracts will cause catastrophic job losses—including for many single mothers—even if the Children's Plans somehow survive. 8.RR.35, 40, 159-61. The risk of job losses also constitutes irreparable harm. *See, e.g.*, *Tex. Dep't of State Health Servs. v. Holmes*, 294 S.W.3d 328, 334 (Tex. App.—Austin 2009, pet. denied) (affirming temporary injunction where applicant testified that, absent relief, "she would be forced to lay off employees and could potentially go out of business").

Notably, the Children's Plans' operations have already been compromised by the Commissioner's notice of intended contract awards—disruption that threatens the Children's Plans' ability to fulfill even their ***current*** obligations and could escalate into a death spiral if the Commissioner is allowed to execute the contracts and finalize the procurement. The Children's Plans are still under contract to provide STAR & CHIP services through at least August 31, 2026, but uncertainty about future contracts will likely cause current members to consider switching plans. And

51

if the presumptive awardees of STAR & CHIP contracts begin to ramp up operations in the Harris, Jefferson, and Tarrant Service Areas, they will likely poach the Children's Plans' experienced STAR & CHIP employees (who are justifiably afraid their current jobs will soon vanish) while the existing contracts are still in effect, CR.3140-41, further jeopardizing the Children's Plans' operations and ability to provide care to their members.

Furthermore, after HHSC issued its preliminary award, the Children's Plans' members and providers were confused about whether Cook Children's would continue to operate, requiring its staff to expend time and effort to clarify the impact of the announced procurement results. 8.RR.160. Notably, Cook Children's was unable to hire a director of network management, a critical position, because multiple qualified candidates turned down the position to seek more stable opportunities elsewhere. *Id*. And Texas Children's has suffered and will continue to suffer disruption in its workforce as its employees voice concerns about their job security in light of the intended contract awards. CR.3140. Such disruption, uncertainty, delay, diminished customer service, and reputational injury all weigh powerfully in favor of temporary injunctive relief. *See, e.g., Intercont'l Terminals Co. v. Vopal N. Am., Inc.*, 354 S.W.3d 887, 895-96 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

**2.    The imminent risk of irreparable harm extends to beneficiaries.**

Courts have recognized "the public interest [] in … ensuring continuing health care to members of the public" when granting injunctive relief. *Welch v. Brown*, 551 F. App'x 804, 814 (6th Cir. 2014) (affirming preliminary injunction); *see also Leddy v. Becerra*, 617 F. Supp. 3d 116, 125 (E.D.N.Y. 2022) ("As the involuntary closure of the subject medical practice would severely, if not irrevocably, harm thousands of patients receiving medical care, the public interest overwhelmingly favors issuance of a TRO."). Here, the Children's Plans' members are at imminent risk of irreparable harm if the Commissioner's unlawful conduct is allowed to continue.

HHSC officials concede that, if the STAR & CHIP contracts are awarded as announced, more than 1.5 million Texans will be forced to switch health plans, and many of those will also have to find new healthcare providers. 5.RR.190; 6.RR.97-98; 7.RR.38-39. Texas Children's serves approximately 420,000 members—more than 40% of the members in the Harris and Jefferson Service Areas. 8.RR.39; 9.RR.PX.38 at 29-30. Cook Children's serves 115,000 members—approximately 40% of the members in the Tarrant Service Area. 8.RR.133; 9.RR.PX.38 at 29. These members, some of Texas's most vulnerable children and expectant mothers, rely on the Children's Plans and their networks of providers for their healthcare. 8.RR.162. Because MCO networks are not identical, 7.RR.118-19, some Medicaid members who are forced to change plans will lose access to primary-care providers,

53

specialty-care providers, or both. For some, this disruption will occur as they are battling life-threatening illnesses and navigating the hardships of economic disadvantage and marginalization. Unsurprisingly, research demonstrates that forcing Medicaid beneficiaries to change providers has negative consequences, including fewer primary-care visits and increased hospitalizations for patients with chronic conditions. *See generally* Becky Staiger*, Disruptions to the Patient-Provider Relationship and Patient Utilization and Outcomes: Evidence from Medicaid Managed Care*, 81 J. HEALTH ECON. 102574 (2022).

Although HHSC rules require new plans to cover care by existing providers for up to ninety days and honor prior authorizations for a set period of time, these safeguards (while laudatory) can fall short in practice because they depend on timely transfer of information between plans. This does not always occur, thus delaying and disrupting care even when a single beneficiary ***voluntarily*** changes plans. 8.RR.162-63, 174-75. Nor do these requirements protect members in all circumstances. One stark example involves autism, which is diagnosed in roughly 4% of children statewide. 8.RR.13. Applied behavioral analysis ("ABA"), a proven treatment for autism in children aged three to five, requires a completed assessment before it is covered. *Id.* But this assessment has a waitlist of seventeen months, and because it is an assessment—not actual treatment—it is ***not*** covered by HHSC's continuity-of-

care rules. 8.RR.13-14.[22] A member on the waitlist who is forced to change plans might therefore have to start "at the back of the line" on another provider's waitlist, *id.*—meaning an involuntary change in health plan can delay treatment for an autistic child. Worse, because ABA treatment loses efficacy after age five, a delay of this sort might prevent a child from receiving the benefit of ABA treatment ***altogether***. *Id.* That, too, is irreparable harm. *See, e.g.*, *Muth v. Voe*, 691 S.W.3d 93, 109-18, 137-38 (Tex. App.—Austin 2024, pet. filed) (recognizing "the deprivation or disruption of medically necessary care" as irreparable harm).

The loss of the Children's Plans would be uniquely prejudicial to their members because the Children's Plans are much more than insurance companies. Each is part of a local, nonprofit, integrated pediatric-healthcare organization, a single coordinated system of providers, hospitals, and clinics. 8.RR.18-19, 33, 129-30, 133-37. For members, this integration brings highly coordinated care not available from other MCOs. *Id.* Integrated healthcare organizations provide more efficient care with higher patient satisfaction than nonintegrated systems. 8.RR.34-35, 137-38. And no other integrated pediatric-healthcare systems operate in the Children's Plans' service areas. 8.RR.135. If the Children's Plans are locked out of STAR & CHIP contracts, every one of their 500,000-plus members will have to

---

[22] Likewise, those rules do not apply to pregnancy care if the mother is at less than twenty-four weeks' gestation. 8.RR.23.

switch to plans that are not part of fully integrated systems, and the care they receive will suffer as a result. *Id.* Many members would have to switch to Molina—the MCO that scored highest in the procurement even though, by HHSC's own admission, it "***does not meet quality of care measure minimum performance standards in any of the programs it operates in***." 5.RR.262 (emphasis added). In the service areas Texas Children's serves, Molina's quality metrics are lowest while Texas Children's boasts the highest. 8.RR.40-43. Other winning bidders in the Children's Plans' service areas—BCBS of Texas and Aetna—also score low on statewide quality metrics. 8.RR.85-86.

### 3. The Commissioner cannot justify these irreparable harms.

The Commissioner makes no attempt to rebut this proof of irreparable injury. Instead, she asserts in conclusory fashion that harm to contractual rights "can rarely establish an irreparable injury," Commissioner.Br.47, and offers a series of technical arguments why she should be allowed to force the Children's Plans out of business and inflict irreparable harm on them and their members while this case is litigated.

*First*, the Commissioner argues that, having "los[t] a fair procurement-bidding process," the Children's Plans cannot ask a court to redress the injuries caused by the expiration of their current contracts. Commissioner.Br.46. This completely misses the mark. The Children's Plans' claims are premised on the unlawfulness of the procurement, the result of which has caused the irreparable harm described

56

above. This does not mean the Children's Plans claim "a right to a new contract." Commissioner.Br.46. They do not. Rather, they simply assert any procurement that leads to such contracts must be conducted lawfully.

*Second*, the Commissioner argues there is no irreparable harm because (1) the Children's Plans have not shown they have a right to a new contract and would have received one but for the Commissioner's unlawful conduct, (2) they can participate in a later procurement, and (3) the harm could be repaired through bid-protest appeals. *Id.* at 46-47; *see also* Molina.Br.55-56. This argument once more misunderstands the Children's Plans' *ultra vires* claims. The claims are not contingent on showing the Children's Plans would have been awarded future contracts, and that is not the relief they request. Instead, their claims are based on the irreparable harm they and their members are suffering from the Commissioner's unlawful conduct and will suffer if the Commissioner's unlawful conduct is allowed to continue. Affirming the temporary injunction is the only way to prevent irreparable harm from occurring by preserving the status quo until the case is decided. It is also unclear how the Children's Plans could participate in a later procurement if they cease to exist due to the Commissioner's actions, just as it is unclear how the bid-protest appeals can confer any legal remedy when it is likely—if not a foregone conclusion—the Commissioner will deny those appeals. *Supra* at 34-37. In short, the temporary injunction is the only way to prevent the irreparable

57

injuries to the Children's Plans and their members from occurring because it will preserve the status quo until their *ultra vires* claims are decided.

### C. The balance of the equities overwhelmingly supports a temporary injunction.

Given the Commissioner's failure to refute the extraordinary, irreparable harm the Children's Plans and their 500,000-plus members will suffer if the temporary injunction is reversed, the Commissioner faces the impossible task of proving the trial court ***abused its discretion*** in balancing the equities in favor of temporary injunctive relief. Under that standard of review, this Court cannot reverse the trial court's ruling unless it "was so arbitrary that it exceeded the bounds of reasonable discretion" and cannot reverse simply because this Court would have balanced the equities differently. *Butnaru*, 84 S.W.3d at 204.

The Commissioner first argues the temporary injunction infringes the State's right to enforce its own laws and thwarts a procurement it spent significant time and resources implementing. Commissioner.Br.44-46. But the Supreme Court has held that *ultra vires* claims exist for the very purpose of preventing a state official's unlawful execution of their duties, holding that "where those laws are being defied or misapplied by a local official, an *ultra vires* suit is a tool to reassert the control of the state." *State v. Hollins*, 620 S.W.3d 400, 405 (Tex. 2020); *see also Chambers-Liberty*, 575 S.W.3d at 348-49 (recognizing exception from sovereign immunity for *ultra vires* claims). At the risk of stating the obvious, there is no legitimate public

interest in allowing the Commissioner to continue illegally inflicting irreparable harm on the Children's Plans and their members based on a patently unlawful procurement. *See, e.g.*, *In re State*, 711 S.W.3d 641, 648 (Tex. 2024) (orig. proceeding) ("The County is not harmed by being required to follow the Texas Constitution."); *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (noting that there is "no public interest in the perpetuation of unlawful agency action").

The Commissioner next suggests affirming the temporary injunction would "greenlight any losing bidder to halt important government functions whenever they are dissatisfied with the outcome," hyperbolically adding that "Plaintiffs' position threatens the very structure of state government itself." Commissioner.Br.48. The Commissioner's argument not only conflicts with Texas law holding that business disruption may constitute irreparable harm, *supra* at 50-52, but plainly reaches too far. If adopted, it would improperly insulate state officials who conduct procurements from *ultra vires* actions, giving them free rein to violate procurement laws enacted by the Legislature and preventing any judicial review or remedy. Furthermore, a party can only obtain a temporary injunction by first establishing a probable right to relief on its claims against the State and irreparable harm. While the Children's Plans have made such a showing, not all plaintiffs will. And once that showing is made, allowing the State to continue violating the law and inflicting irreparable harm does not justify preserving the status quo. *See, e.g.*, *In re Newton*,

59

146 S.W.3d 648, 651 (Tex. 2004) (orig. proceeding) ("The plaintiffs argue that the continuation of illegal conduct cannot be justified as preservation of the status quo, and of course we agree."); *City of San Marcos*, 714 S.W.3d at 245 ("Where the acts sought to be enjoined constitute violation of the law … the status quo to be preserved cannot be a continuation of those acts."). The only genuine threat to "the very structure of state government" in this case is giving the Commissioner the unchecked discretion she is demanding without holding her accountable to the people her unlawful conduct irreparably harms and the Legislature whose laws she violates.

The Commissioner next argues the equities militate against injunctive relief because the Children's Plans allegedly slept on their rights by failing to object to the procurement's solicitation before submitting their bid proposals. Commissioner.Br.46-48; *see also* Molina.Br.57-58. However, as shown above, the Children's Plans could not have objected in advance to the Commissioner's failure to comply with her express promise in the solicitation to conduct the procurement in accordance with Texas law. *Supra* at 46.

The Commissioner next argues the temporary injunction somehow harms Texans "who rely on HHSC's timely and efficient procurement of Medicaid and CHIP funds" by "creat[ing] uncertainty." Commissioner.Br.48. The exact opposite is true. Affirming the temporary injunction allows Texans to continue receiving essential care, without disruption, from the same providers through the same health

plans they have used for years until this lawsuit is resolved. CR.5882; 5.RR.181. Allowing the unlawful procurement to continue, on the other hand, will cause the Children's Plans' 500,000-plus members to lose access to the unique, mission-driven, high-quality integrated pediatric-healthcare organizations that only the Children's Plans offer, *supra* at 9-11, 53-56, and that the undisputed evidence shows is better for Medicaid beneficiaries, 8.RR.34-35, 137-38.

Finally, the Commissioner argues halting the issuance of the awards contradicts Texas public policy, citing a statute stating "[i]t is the intent of the Legislature that agencies and institutions minimize the use of extensions that extend a contract beyond the base term and any optional extensions provided in a contract." Commissioner Resp. 50-51. But the statute does ***not*** say that contract extensions are prohibited or against the public interest. It merely provides that contract extensions should be minimized and, even then, does not explain when contract extensions should and should not be granted. It strains credulity to conclude from this general guidance that the Legislature would oppose the extension of an existing contract if the proposed replacement contract was the product of the Commissioner's unlawful disregard of the Legislature's own procurement laws.

### D. The temporary injunction does not violate Texas Rule of Civil Procedure 683.

The Commissioner incorrectly claims the trial court's temporary injunction violates Rule 683 because it does not include detailed findings of fact and

61

conclusions of law rebutting the Commissioner's arguments against its issuance. Commissioner.Br.51-53.

*First*, the Commissioner waived that objection. While Texas courts are divided on whether noncompliance with Rule 683 may be raised for the first time on appeal, the Third and Seventh Courts have held these objections are waived if not preserved below. *See, e.g.*, *Taylor Hous. Auth. v. Shorts*, 549 S.W.3d 865, 880 (Tex. App.—Austin 2018, no pet.) ("Under this Court's longstanding precedent, a complaint of noncompliance with this requirement of Rule 683 is considered one of form that is waived unless preserved before the trial court."); *Tex. Tech Univ. Health Scis. Ctr. v. Rao*, 105 S.W.3d 763, 768 (Tex. App.—Amarillo 2003, pet. dism'd) (same). That accords with "general principles of sound judicial administration" requiring "any objections to the form and content of an injunction be pointed out to the trial court at a time when the errors could be corrected." *Rao*, 105 S.W.3d at 768. It also prevents gamesmanship, as it "serves no good purpose to permit appellants to lie in wait and present this error in form for the first time on appeal." *Id.*

*Second*, waiver aside, the Commissioner's argument fails on the merits. Rule 683 requires that "[e]very order granting an injunction … shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained." The trial court's order easily satisfies these requirements. It specifically

62

details the reasons for its issuance, identifying at least thirteen statutory mandates the Commissioner "has violated and will continue to violate" and fourteen reasons why the "execution and implementation of the contracts would result in irreparable harm" to the Health Plans. CR.5877-82. The order also describes in reasonable detail what the Commissioner is barred from doing: (1) "awarding, signing, entering into, executing, implementing, or otherwise taking action to effectuate or perform any contracts resulting from or in connection with the STAR & CHIP [procurement] or to further the procurement or contracting processes for the STAR & CHIP [procurement]"; and (2) "further proceeding with the procurement of, issuing a notice of intent to award or awarding contracts under, or otherwise implementing results from the STAR Kids [procurement]." CR.5883.

The cases cited by the Commissioner are inapposite. The TRO in *In re Luther* failed to identify "any particular state, county, or city regulation that [defendant] violated, is threatening to violate, or is being commanded to stop violating." 620 S.W.3d 715, 722 (Tex. 2021) (orig. proceeding) (per curiam). And the temporary injunction in *Independent Capital Management, LLC v. Collins*, in a single sentence, "simply set[] out the elements necessary for injunctive relief" and "d[id] not specify the facts the trial court relied on." 261 S.W.3d 792, 795-96 (Tex. App.—Dallas 2008, no pet.). In contrast, the order here spans ten pages and amply details the grounds

63

for injunctive relief. CR.5875-84. Neither Rule 683 nor case law requires a temporary injunction to expressly rebut the arguments against its issuance.

### E.    The trial court did not abuse its discretion in excluding the procurement's consensus scoring rubrics.

The Commissioner's final argument is that the trial court erred by excluding consensus scoring rubrics the Commissioner attempted to introduce on the last day of the hearing, without proffering any witness who had personal knowledge of them. Commissioner.Br.53-57. But the Commissioner's claim that those rubrics were "highly probative" contradicts the deposition testimony of HHSC's corporate representative, who swore not only that they were not the documents that would reveal how the statutory preferences at the heart of this case were purportedly applied but also that he had reviewed only one or two of the rubrics. 5.RR.228, 233-34; 6.RR.216.

For the exclusion of evidence to constitute reversible error, the complaining party bears the heavy burden of showing "(1) the trial court did in fact commit error and (2) that the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment." *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). Evidentiary rulings are reviewed for abuse of discretion, *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998), which occurs when the trial court acts without regard for any guiding rules or principles, *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753-54 (Tex. 1995). The

64

reviewing court "must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling," *Owens-Corning*, 972 S.W.2d at 43, and "may not substitute its own judgment for the trial court's judgment," *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003). To establish the ruling "probably resulted in an improper judgment," the complaining party must show the order "turns on the particular evidence excluded or admitted" based on a review of the entire record. *Alvarado*, 897 S.W.2d at 753-54. That the ruling "might have" or "could have" resulted in an improper order is not enough. *Gunn v. McCoy*, 554 S.W.3d 645, 671 (Tex. 2018).

Here, the Commissioner has shown neither error nor prejudice.

*First*, the trial court did not act without regard for guiding rules or principles when it excluded the consensus scoring rubrics. The Commissioner suggests the rubrics constitute "a business record, admissible under Texas Rule of Evidence 803(6)." Commissioner.Br.54. But this hearsay exception requires the three conditions of admissibility—the record was made by someone with knowledge, the record was kept in regular course of business, and making the record was a regular practice—to be "shown by the testimony of the custodian or another qualified witness." TEX. R. EVID. 803(6)(D). Although the Commissioner claims "that is precisely how HHSC offered the evidence," Commissioner.Br.54, no such foundation was actually laid. The portion of the record she cites for Mr. Ramirez's supposed familiarity "with the creation and maintenance of the scoring rubrics" is a

65

colloquy about the ***blank template*** scoring rubric generally, not the completed rubrics the Commissioner elsewhere sought to admit—none of which Mr. Ramirez created and only one or two of which he even reviewed. *Id.* at 55 (citing 20.RR.345-46). Mr. Ramirez's purported foundation could not have "substantially complie[d]" with Rule 803(6) because such a foundation was never sought. *McElroy v. Unifund CCR Partners*, No. 14-07-00661-CV, 2008 WL 4355276, at *3 (Tex. App.—Houston [14th Dist.] Aug. 26, 2008, no pet.) (considering compliance of foundational affidavit submitted for purpose of establishing business-records exception). The trial court's exclusion of hearsay evidence that lacked the necessary foundation for admission under the business-records exception cannot be error.

*Second*, even if the exclusion was an abuse of discretion (it was not), any error was harmless. The absence of detail in the Commissioner's claim of prejudice is telling. She conclusorily suggests "[i]t is difficult to conceive of how the case could ***not*** turn on evidence of how the bidders' proposals were scored," Commissioner.Br.57, but offers no support for her speculation. The Commissioner's failure underscores what Mr. Ramirez himself confirmed during his deposition as HHSC's designated representative: The consensus scoring rubrics are not probative of whether the Commissioner applied the preferences and consideration at issue in this case. When asked about documentary evidence of, for example, application of the Section 536.052(d) preference, Mr. Ramirez indicated the ***only*** document

66

reflecting such a preference is the master rollup scoring sheet—***not*** the various consensus scoring rubrics. 8.RR.146-150; 12.RR.PX.320. This response reflected his overall contention that the statutory and regulatory mandates at issue were allegedly "baked in" to bidders' scores and thus reflected in the master rollup of scores but not individually ascertainable in the consensus scoring rubrics. 5.RR.236. Put plainly, if Mr. Ramirez was unable to identify any probative evidence in the consensus scoring rubrics during his corporate-representative deposition or at the temporary injunction hearing, then the Commissioner should not be heard now to contradict his position—especially where she identifies no specific basis for that revisionism.

That Mr. Ramirez served as HHSC's corporate representative further supports affirming the exclusion of the consensus scoring rubrics. Corporate representatives must be able to "testify as to matters that are known or reasonably available to the organization." Tex. R. Civ. P. 199.2. Mr. Ramirez was thus obligated to provide "complete, knowledgeable, and binding answers on behalf of" HHSC, *In re FINA Oil & Chem. Co.*, No. 13-98-640-CV, 1999 WL 33589153, at \*4 (Tex. App.—Corpus Christi–Edinburg Mar. 11, 1999, no pet.) (not designated for publication) (citation modified))—including testifying as to the Commissioner's position that the rubrics reflected statutory preferences and considerations, if this were indeed true. Yet his preparation did not involve reviewing the rubrics, confirming the

Commissioner's position that the statutory preferences were reflected elsewhere and that the rubrics were therefore immaterial. The Commissioner is barred from now contending the rubrics are probative, since "[w]hen [a corporate] representative claims ignorance of a subject during the deposition, courts [] preclude[] the corporation from later introducing evidence on that subject"—thus "avoid[ing] trial by ambush." *Function Media, LLC v. Google, Inc.*, No. 2:07-CV-279-CE, 2010 WL 276093, at *1 (E.D. Tex. Jan. 15, 2010) (citation modified). Because Mr. Ramirez expressly disclaimed knowledge of the rubrics, the trial court did not abuse its discretion in excluding them on fairness grounds as well as evidentiary grounds. 8.RR.156 ("I'm not going to allow the exhibit in. I think it is trial by ambush from what I can tell.").

## CONCLUSION

For the reasons herein, the Children's Plans respectfully request that this Court (1) affirm the trial court's October 4, 2024, order denying the Commissioner's plea to the jurisdiction and granting a temporary injunction and (2) grant the Children's Plans any and all other relief to which they are entitled.

Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP      ALEXANDER DUBOSE & JEFFERSON

By /s/ *Warren S. Huang*
Susan Feigin Harris
State Bar No. 06876980
susan.harris@nortonrosefulbright.com
Warren S. Huang
State Bar No. 00796788
warren.huang@nortonrosefulbright.com
1550 Lamar, Suite 2000
Houston, Texas 77010
Telephone: (713) 651-5151

Paul D. Trahan
State Bar No. 24003075
paul.trahan@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
Telephone: (512) 474-5201

Thomas A. Coulter
tom.coulter@nortonrosefulbright.com
State Bar No. 04885500
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1100
Washington, D.C. 20001
Telephone: (202) 662-0200

*Counsel for Appellee*
*Texas Children's Health Plan*

By /s/ *Amy Warr*
Amy Warr
State Bar No. 00795708
awarr@adjtlaw.com
Anna M. Baker
State Bar No. 00791362
abaker@adjtlaw.com
100 Congress Avenue, Suite 1450
Austin, Texas 78701
Telephone: (512) 482-9300

Karen C. Burgess
State Bar No. 00796276
kburgess@burgesslawpc.com
Katie Dolan-Galaviz
State Bar No. 24069620
kgalaviz@burgesslawpc.com
BURGESS LAW PC
404 West 13th Street
Austin, Texas 78701
Telephone: (512) 482-8808

Matthew P. Gordon
*Admission Pro Hac Vice*
mgordon@perkinscoie.com
PERKINS COIE LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Telephone: (206) 359-8000

*Counsel for Appellee*
*Cook Children's Health Plan*

**CERTIFICATE OF COMPLIANCE WITH TEXAS RULE OF APPELLATE PROCEDURE 9.4(I)(3)**

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), the undersigned counsel – in reliance upon the word count of the computer program used to prepare this document – certifies that this brief contains 14,761 words, excluding the words that need not be counted under Texas Rule of Appellate Procedure 9.4(i)(1).

/s/ Warren S. Huang
Warren S. Huang

**CERTIFICATE OF SERVICE**

Undersigned counsel certifies that a copy of Brief of Appellees Cook Children's Health Plan and Texas Children's Health Plan was served in compliance with Texas Rule of Appellate Procedure 9.5 via the electronic filing manager or electronic mail on December 9, 2025, upon all counsel of record:

Ken Paxton
Attorney General of Texas
Brent Webster
First Assistant Attorney General
William R. Peterson
Solicitor General
William F. Cole
Principal Deputy Solicitor General
william.cole@oag.texas.gov
Cory A. Scanlon
Assistant Solicitor General
cory.scanlon@oag.texas.gov
Jeffrey A. Stephens
Assistant Solicitor General
Mohmed I. Patel
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-25848

*Counsel for Appellant Cecile Erwin Young,*
*In Her Official Capacity as Executive*
*Commissioner of the Texas Health and*
*Human Services Commission*

FOLEY & LARDNER LLP

Robert F. Johnson III
State Bar No. 10786400
rjohnson@foley.com
600 Congress Avenue, Suite 3000
Austin, Texas. 78701
Telephone: (512) 542-7000

Michelle Y. Ku
State Bar No. 24071452
mku@foley.com
Stacy R. Obenhaus
State Bar No. 15161570
sobenhaus@foley.com
FOLEY & LARDNER LLP
2021 McKinney, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-3000

Benjamin J. Grossman
*Of Counsel*
bjgrossman@foley.com
FOLEY & LARDNER LLP
106 East College Avenue, Suite 900
Tallahassee, Florida 32301
Telephone: (850) 222-6100

*Counsel for Appellee Wellpoint
Insurance Company*

HOLLAND & KNIGHT LLP

Richard B. Phillips, Jr.
State Bar No. 24032833
rich.phillips@hklaw.com
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 964-9500

Karen D. Walker
*Admission Pro Hac Vice*
karen.walker@hklaw.com
Tiffany Roddenberry
*Admission Pro Hac Vice*
tiffany.roddenberry@hklaw.com
HOLLAND & KNIGHT LLP
315 South Calhoun Street, Suite 600
Tallahassee, Florida 32301
Telephone: (850) 425-5612

*Counsel for Appellee Superior
Health Plan, Inc.*

      /s/ Warren S. Huang
      Warren S. Huang

# INDEX TO APPENDIX

TAB 1      Temporary Injunction and Order Denying Defendant's Plea to the Jurisdiction

TAB 2      Texas Government Code § 2155.144

TAB 3      Texas Government Code § 533.003

TAB 4      Texas Government Code § 536.052

TAB 5      Texas Government Code § 533.0035

TAB 6      Texas Government Code § 533.002

TAB 7      Texas Government Code § 533.001

TAB 8      Texas Government Code § 533.004

TAB 9      Texas Health & Safety Code § 62.155

TAB 10    1 Texas Administrative Code § 391.101

TAB 11    1 Texas Administrative Code § 391.209

TAB 12    34 Texas Administrative Code § 20.208(d)(3)

TAB 13    Texas Government Code § 552.104

TAB 14    Texas Attorney General Open Records Letter Ruling OR2023-034773

TAB 15    Texas Attorney General Open Records Letter Ruling OR2024-018260

TAB 16    Texas Attorney General Open Records Letter Ruling OR2024-019071

TAB 17    1 Texas Administrative Code § 391.303(d)

TAB 18    Texas Government Code § 524.0002

TAB 19    1 Texas Administrative Code § 391.307

# APPENDIX TAB 1

Filed in The District Court
of Travis County, Texas

OCT 0 4 2024

At _____4:41_____ p ___ M.

Velva L. Price, District Clerk

CAUSE NO. D-1-GN-24-003839

| | | |
|---|---|---|
| COOK CHILDREN'S HEALTH PLAN;<br>TEXAS CHILDREN'S HEALTH PLAN;<br>SUPERIOR HEALTHPLAN, INC.; and<br>WELLPOINT INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>CECILE ERWIN YOUNG, in her official<br>capacity as Executive Commissioner of the<br>Texas Health and Human Services<br>Commission,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT<br><br><br><br><br><br><br>TRAVIS COUNTY, TEXAS<br><br><br><br><br><br>353rd JUDICIAL DISTRICT |

## TEMPORARY INJUNCTION AND ORDER DENYING DEFENDANT'S PLEA TO THE JURISDICTION

Before the Court are the Applications for Temporary Injunction (the "Applications") filed by Plaintiffs Cook Children's Health Plan ("Cook Children's"), Texas Children's Health Plan ("TCHP"), Superior HealthPlan, Inc. ("Superior"), and Wellpoint Insurance Company ("Wellpoint," and collectively, "Plaintiffs"); and the Plea to the Jurisdiction (the "Plea") filed by Defendant Cecile Erwin Young ("Defendant"), in her official capacity as Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"). After considering Plaintiffs' Applications and Defendant's response; Defendant's Plea and Plaintiffs' responses; the pleadings and attached evidence in these consolidated cases (Nos. D-1-GN-24-003839, D-1-GN-24-003874, D-1-GN-004059, and D-1-GN-24-004327); the parties' prehearing briefing; the evidence admitted in the record and adduced at the hearing held on September 30, October 1, October 2, and October _____ applicable authorities; the arguments of counsel, and all other matters properly before the Court, the Court DENIES Defendant's Plea and GRANTS Plaintiffs' Applications.

251.2

Page 1 of 10

Page 5885

The Court makes the following findings:

1. The Court has subject-matter jurisdiction over the claims in these consolidated cases because Plaintiffs have alleged and offered evidence demonstrating that Defendant will act *ultra vires* in awarding, executing, and implementing the contracts arising out of Request for Proposals No. HHS0011152 (the "RFP" or "STAR & CHIP RFP") because she has acted *ultra vires* in administering the RFP. Plaintiffs properly seek only prospective relief—specifically, injunctive relief prohibiting Defendant from awarding, executing, or otherwise implementing the intended RFP contracts and thus preventing further unlawful acts in connection with Defendant's procurement or contracting processes, as well as accompanying declaratory relief. Accordingly, sovereign immunity does not bar Plaintiffs' claims or deprive the Court of subject-matter jurisdiction.

2. The Court has personal jurisdiction over the parties in these consolidated cases.

3. Venue is proper in this Court.

4. Through the RFP, Defendant sought to procure managed care services for the State of Texas Access Reform ("STAR") Medicaid program and the Children's Health Insurance Program ("CHIP," and together with STAR, "STAR & CHIP").

5. Plaintiffs allege that Defendant administered the RFP in a manner that violates Texas law and that, consequently, any award, execution, or implementation of the intended STAR & CHIP managed care contracts that Defendant announced on March 7, 2024, will constitute *ultra vires* acts.

6. Plaintiffs have established a cause of action against Defendant and a probable right to the relief sought on their claims that Defendant has violated and, unless enjoined, will continue to violate statutory and regulatory requirements applicable to the RFP.

7. Specifically, Plaintiffs have established that Defendant has violated and will continue to violate the Texas Government Code, Texas Health and Safety Code, and Texas Administrative Code in procuring managed care contracts for STAR & CHIP in Texas, and that any award, execution, or implementation of Defendant's intended contract awards would be unlawful, because:

- Defendant's intended contract awards will fail to give preference to managed care organizations ("MCOs") that have significant participation in their provider networks from each healthcare provider in the region who has traditionally provided care to Medicaid and charity care patients as required by Texas Government Code § 533.003(a)(1);

- Defendant's intended contract awards will fail to give preference to MCOs that have successfully implemented quality initiatives as required by Texas Government Code § 536.052(a) and (d);

- Defendant has failed to develop and implement the cost-efficiency and quality of care benchmarks mandated by Texas Government Code § 536.052(b) despite being subject to an obligation to do so for over a decade. Defendant's intended contract awards will likewise fail to give preference to MCOs that have met such benchmarks as required by Texas Government Code § 536.052(d);

- Defendant's intended contract awards will fail to consider MCOs' past performances as required by Texas Government Code § 2155.144;

- Defendant's intended contract awards will fail to evaluate and certify that MCOs are reasonably able to fulfill the terms of the STAR contract as required by Texas Government Code § 533.0035 and to review MCOs to confirm their ability to fulfill the requirements of the CHIP contract as required by Texas Health & Safety Code § 62.051(e);

- In August 2023 and again in October 2023, Defendant wrongfully disclosed the RFP proposals of Plaintiffs and other respondents—with the August disclosure recipients including legal counsel for Aetna, one of the competing respondents, while the procurement was ongoing and prior to completion of the oral presentations—thus, destroying any integrity of the procurement process and creating an unlevel playing field that cannot ensure fair consideration of all proposals and is far from consistent, uniform, and transparent as required by 1 Texas Administrative Code §§ 391.101 and 391.209;

- Defendant's intended contract awards will fail to implement the Medicaid managed care program in a manner that improves the health of Texans by promoting

DISTRICT COURT OF TRAVIS COUNTY TEXAS

continuity of care and provides a medical home for recipients as required by Texas Government Code § 533.002;

- Defendant's intended contract awards will fail to reduce administrative and other nonfinancial barriers for recipients as required by Texas Government Code § 533.002;

- Defendant's intended contract awards will fail to consider the need to use different managed care plans to meet the needs of different populations as required by Texas Government Code § 533.003(a)(3);

- Defendant's intended contract awards will unlawfully award mandatory CHIP contracts to MCOs to which Defendant intends to award mandatory STAR contracts in violation of Texas Health and Safety Code §§ 62.055 and 62.155;

- Defendant's intended award of mandatory CHIP contracts will fail to give consideration to statutorily required factors, including those under Texas Government Code § 533.003, in violation of Texas Government Code § 533.004(a);

- Defendant's continuing practice of denying relevant information about a procurement to bidders until after the deadline to submit a bid protest violates the Due Course of Law provision of Article I, Section 13 of the Texas Constitution by not providing a meaningful bid protest process after promising one in 1 Texas Administrative Code Chapter 391; and

- Defendant's continuing practice of refusing to consider as untimely any information submitted in supplemental protests and/or after the protest filing deadline is inconsistent with the procedural protections promised to protestants in bid protest rules that require consideration of a protest or appeal submitted after the filing deadline when good cause for delay is shown under 1 Texas Administrative Code § 391.307(d)(1).

8. These statutory and regulatory violations, each singly and together collectively, have resulted in intended contract awards that will be invalid and unlawful, and the further execution and implementation of such intended contract awards will be *ultra vires* acts.

9. Furthermore, Defendant is currently evaluating bids for STAR Kids, a separate Texas Medicaid managed care program, through Request for Proposals No. HHS0013071 (the "STAR Kids RFP"). The procurement processes in the STAR & CHIP RFP and the STAR Kids RFP are substantively identical. Plaintiffs have demonstrated that Defendant has no intention of

voluntarily correcting her course of action for future procurements, including altering the processes and procedures used in administering the STAR Kids RFP. The resulting STAR Kids contract awards will therefore also violate statutory and regulatory requirements and be *ultra vires*.

10. Plaintiffs have established a probable right to relief and that Defendant's award, execution, and implementation of the intended, unlawfully procured STAR & CHIP contracts will, if not enjoined, cause Plaintiffs to suffer imminent and irreparable injury.

11. Cook Children's has established that execution and implementation of the contracts would result in irreparable harm to Cook Children's because:

- The loss of STAR & CHIP contracts threatens Cook Children's financial viability and might lead to the forced wind-down of the entity;

- Cook Children's participation in the STAR Kids program is in jeopardy because the larger STAR & CHIP contracts provide economies of scale to limit losses from STAR Kids;

- Cook Children's 100,000-plus STAR & CHIP members will be forced to change to different health plans from different companies, risking disruption to the members' healthcare and their access to their current primary care providers, specialty care providers, or both;

- Cook Children's has suffered immediate operational disruptions, including hiring difficulties and the delay of needed internal projects;

- Cook Children's can no longer negotiate a new pharmacy benefits contract alongside other Texas-only Medicaid plans and consequently will need to pay more for pharmaceuticals;

- Cook Children's 375 employees are at risk of losing their jobs—both the 70% of employees who focus on STAR & CHIP and the 30% who focus on STAR Kids; and

- New STAR & CHIP entrants in the Tarrant Service Area will likely poach Cook Children's experienced employees before the new contracts go into effect—thus threatening Cook Children's STAR & CHIP operations while it is still required to provide services under its current contracts.

12. TCHP has established that execution and implementation of the contracts would result in irreparable harm to TCHP because:

Page 5889

- TCHP's 425,000 STAR & CHIP members will be forced to change their health plans, impacting their access to care;

- TCHP has suffered and will continue to suffer disruptions in workforce—threatening the future viability of the health plan—as employees voice concern about job security in light of the intended contract awards;

- TCHP's 650 employees are at risk of losing their jobs, impacting the financial health of its entire Texas Children's Health Care System beyond that of the health plan;

- TCHP has already suffered and will continue to suffer the poaching of its well-trained employees by other MCOs—further endangering its operations while it remains under contract with HHSC;

- TCHP will lose members and providers, further threatening the viability of the health plan and confusing members and providers;

- TCHP has and will suffer damage to its reputation and goodwill; and

- TCHP's participation in the STAR Kids program is at risk because the larger STAR & CHIP contracts are needed to provide economies of scale to limit losses from STAR Kids. If TCHP loses its STAR Kids contract, its 26,000 STAR Kids members would need to change their health plans, thereby adversely impacting those members' access to care, adversely impacting TCHP's workforce, adversely impacting TCHP's ability to operate and damaging TCHP's reputation and goodwill.

13. Superior has established that execution and implementation of the contracts would result in irreparable harm to Superior because:

- Superior will experience a reduction in the number of STAR & CHIP members it serves today, forcing members to change plans even before the operational start date of the new contracts;

- Superior will need to begin reducing its workforce just as new MCO entrants and MCOs expanding their membership will seek to poach Superior's employees, who are already grappling with the uncertainty of their jobs in light of the intended awards;

- Providers will be less likely to contract with Superior as contract renewals are being negotiated over the next few months and Superior's leverage in provider contract negotiations will be substantially diminished;

Superior has made substantial investments in partnerships that promote HHSC's value-based care priorities. These partnerships involve risk-sharing agreements



between Superior and the partner entities and have been built to scale over time. Superior will lose the benefit of its initial investments in these partnerships; and

- Superior's ability to provide the same level of service currently provided under existing STAR & CHIP contracts through the August 31, 2025, expiration date will be diminished due to workforce challenges that would be caused by execution of the STAR & CHIP contracts, which will impact Superior's operations and cause it to suffer reputational damage.

14.     Wellpoint has established that execution and implementation of the contracts would result in irreparable harm to Wellpoint because:

- Almost 380,000 current Wellpoint members will be forced to change their health plan, thus losing access to their existing Wellpoint provider network;

- Wellpoint will be forced to consider substantial reductions in and/or relocations of its existing 1,200-plus-person workforce dedicated to the Texas Medicaid programs;

- Wellpoint has already suffered and will continue to suffer the poaching of its highly trained employees by other MCOs. During the review and transition period, which HHSC has stated will take at least a full year, Wellpoint must continue to provide uninterrupted healthcare to its members, and its ability to do so will be substantially jeopardized if there are key staff vacancies;

- Wellpoint has already suffered and will continue to suffer difficulty retaining its existing, robust provider network in the impacted service areas. Maintaining its network of healthcare providers is critical to Wellpoint's commitment to providing high-quality, cost-efficient healthcare for the entire duration of its existing contracts. Worse yet, Wellpoint has learned that some providers are informing members that Wellpoint will no longer be providing STAR & CHIP services in impacted areas and are encouraging them to switch plans on the basis of Defendant's intended contract awards;

- Wellpoint has made significant investments in service areas that it will be forced to exit and has longstanding provider partnerships with alternative payment models that were developed and built to scale over multiple years. Wellpoint will lose the benefit of its investments in those service areas and partnerships.

- There is no legal remedy that can fully compensate Wellpoint for (1) the loss of its members, (2) the harm to its business resulting from the intended, unlawfully procured contract awards, and (3) the harm to its ability to compete in a fair and lawful procurement process in future procurements; and

- The harm to Wellpoint is imminent because Defendant did not follow the requirements of Texas law in procuring the STAR & CHIP contracts but



nevertheless intends to execute and begin implementing the intended, unlawfully procured contract awards. In addition, the harm to Wellpoint is imminent as Defendant does not intend to correct her unlawful course of action for future procurements or the ongoing STAR Kids RFP.

15. Plaintiffs have also presented evidence that they will begin losing STAR & CHIP members now, even though operations under the intended STAR & CHIP contract awards are not scheduled to start until September 1, 2025. Providers are already informing Plaintiffs' members that Plaintiffs will no longer be providing STAR & CHIP services in certain service areas of the state and are encouraging members to switch plans. The confusion among providers and members alike will only worsen if the intended contract awards are executed notwithstanding the pending challenge to their legality.

16. Money damages are not adequate compensation because the harms Plaintiffs will suffer cannot be measured by any certain pecuniary standard. Furthermore, Plaintiffs cannot be adequately compensated in damages because Defendant is immune from suit for damages and any limited waiver of immunity is insufficient to compensate for Plaintiffs' harms.

17. The harms to Plaintiffs outweigh any potential harms to Defendant or HHSC that would result from preserving the status quo during the pendency of these consolidated cases. Neither Defendant nor HHSC would be harmed if the execution and further implementation of the intended STAR & CHIP contracts are delayed given that (1) operations under the intended contract awards are not scheduled to start until September 1, 2025, and (2) HHSC has previously delayed the RFP several times and was able to continue providing coverage through the current STAR & CHIP contracts by extending the contracts in effect at the time.

18. The public will not suffer harm if a temporary injunction is granted but will suffer harm if Defendant executes and implements the intended, unlawfully procured contract awards. The intended contract awards will impose significant harm and confusion on millions of Texas's

STAR & CHIP members. More than 1.5 million Texans, mostly children—and 43% of the total STAR & CHIP population—will be forced to change health plans. This in turn would cause significant harms to those beneficiaries, for which there is no adequate remedy at law available against Defendant, including:

- Confusion among those beneficiaries due to difficulties in informing them of the change in available health plans;

- Disruption to those beneficiaries' access to care and continuity of care, thereby threatening the medical care and the very health and welfare of those beneficiaries; and

- Administrative burdens of finding new health plans and potentially new healthcare providers.

19. The injunctive relief Plaintiffs request is narrow in scope and tailored to prohibit Defendant from continuing to act *ultra vires*. The balance of equities and public interest weigh in favor of granting Plaintiffs' requested injunctive relief.

Accordingly, it is therefore ORDERED that Defendant's Plea to the Jurisdiction is DENIED.

It is further ORDERED that Plaintiffs' Applications for Temporary Injunction are GRANTED. The Court ORDERS that:

- Defendant, and all other persons or entities in active concert or participation with Defendant, shall refrain from awarding, signing, entering into, executing, implementing, or otherwise taking action to effectuate or perform any contracts resulting from or in connection with the STAR & CHIP RFP or to further the procurement or contracting processes for the STAR & CHIP RFP; and

- Defendant, and all other persons or entities in active concert or participation with Defendant, shall refrain from further proceeding with the procurement of, issuing a notice of intent to award or awarding contracts under, or otherwise implementing results from the STAR Kids RFP.



IT IS FURTHER ORDERED that Defendant shall provide notice of this Temporary Injunction to her officers, agents, servants, employees, and attorneys, as well as any persons or entities in active concert or participation with Defendant.

IT IS FURTHER ORDERED that Plaintiffs' bond or cash deposit in lieu of bond is set in the amount of $1,000.

IT IS FURTHER ORDERED that, on the filing by Plaintiffs of the bond and on approving the bond according to law (or the cash deposit in lieu of bond), the Clerk shall issue a Temporary Injunction in conformity with the law and the terms of this order.

IT IS FURTHER ORDERED that this Temporary Injunction shall not expire until final judgment in this case is entered or this case is otherwise dismissed by this Court.

IT IS FURTHER ORDERED that the trial on Plaintiffs' *ultra vires* claims seeking declaratory relief, permanent injunctive relief, and mandamus relief is set for November 3, 2025.

SIGNED on ___October 4___, 2024.

_____
JUDGE PRESIDING

**Judge Laurie Eiserloh**
**455th District Court**

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office On 11/01/2024 09:28:21

VELVA L. PRICE
DISTRICT CLERK
By Deputy: SH
169317251.2

# APPENDIX TAB 2

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle D. State Purchasing and General Services (Refs & Annos)
        Chapter 2155. Purchasing: General Rules and Procedures (Refs & Annos)
          Subchapter C. Delegations of and Exclusions from Comptroller's Purchasing Authority and Certain
          Exemptions from Competitive Bidding

V.T.C.A., Government Code § 2155.144

§ 2155.144. Procurements by Health and Human Services Agencies

Currentness

(a) This section applies only to the Health and Human Services Commission, each health and human services agency, the Department of Family and Protective Services, and agencies administratively attached to the Health and Human Services Commission. For the purposes of this section, the Department of Family and Protective Services or an agency administratively attached to the Health and Human Services Commission is considered a health and human services agency.

(b) An agency to which this section applies is delegated the authority to procure its goods and services, except as provided by this section.

(b-1) An agency to which this section applies is not delegated the authority to procure common commodities or services:

(1) including goods and services acquired for direct consumption or use by the agency in the day-to-day support of the agency's administrative operations, such as office supplies and equipment, building maintenance and cleaning services, or temporary employment services; and

(2) not including consulting services, professional services, health care services, information resources technology, goods or services acquired for the benefit or on behalf of clients of programs operated by the agency, procurements specifically authorized or delegated to the agency by statute, or the contracting out of agency purchasing functions or other administrative or program functions.

(b-2) The Health and Human Services Commission is delegated the authority to procure goods and services related to a contract for:

(1) a project to construct or expand a state hospital operated by a health and human services agency or a state supported living center as defined by Section 531.002, Health and Safety Code; or

(2) a deferred maintenance project for a health facility described by Subdivision (1).

(b-3) Notwithstanding any other law, the Texas Civil Commitment Office is delegated the authority to procure common commodities or services described by Subsection (b-1)(1) for office use if the total cost of the purchase is less than the total cost of the purchase under the comptroller's purchasing authority or as offered for sale as provided by Chapter 122, Human Resources Code. The Texas Civil Commitment Office, in collaboration with the comptroller, shall identify best practices for comparing the total costs and documenting cost savings.

(c) An agency to which this section applies shall acquire goods or services by any procurement method approved by the Health and Human Services Commission that provides the best value to the agency. The agency shall document that it considered all relevant factors under Subsection (d) in making the acquisition.

(d) Subject to Subsection (e), the agency may consider all relevant factors in determining the best value, including:

(1) any installation costs;

(2) the delivery terms;

(3) the quality and reliability of the vendor's goods or services;

(4) the extent to which the goods or services meet the agency's needs;

(5) indicators of probable vendor performance under the contract such as past vendor performance, the vendor's financial resources and ability to perform, the vendor's experience and responsibility, and the vendor's ability to provide reliable maintenance agreements;

(6) the impact on the ability of the agency to comply with laws and rules relating to historically underutilized businesses or relating to the procurement of goods and services from persons with disabilities;

(7) the total long-term cost to the agency of acquiring the vendor's goods or services;

(8) the cost of any employee training associated with the acquisition;

(9) the effect of an acquisition on agency productivity;

(10) the acquisition price; and

(11) any other factor relevant to determining the best value for the agency in the context of a particular acquisition.

(e) Repealed by Acts 2003, 78th Leg., ch. 785, § 75(2).

(f) The state auditor may audit the agency's acquisitions of goods and services before or after a warrant is issued to pay for an acquisition.

(g) The agency may adopt rules and procedures for the acquisition of goods and services under this section.

(h) The Health and Human Services Commission shall adopt rules and procedures for the acquisition of goods and services under this section that apply to all health and human services agencies, including rules adopted with the commission's assistance that allow an agency to make purchases through a group purchasing program except when a better value is available through another procurement method. The rules of the health and human services agencies must be consistent with the rules of the Health and Human Services Commission.

(i) Subject to Section 524.0001(b), the Health and Human Services Commission shall develop a single statewide risk analysis procedure. Each health and human services agency shall comply with the procedure. The procedure must provide for:

(1) assessing the risk of fraud, abuse, or waste in health and human services agencies contractor selection processes, contract provisions, and payment and reimbursement rates and methods for the different types of goods and services for which health and human services agencies contract;

(2) identifying contracts that require enhanced contract monitoring; and

(3) coordinating contract monitoring efforts among health and human services agencies.

(j) Subject to Section 524.0001(b), the Health and Human Services Commission shall publish a contract management handbook that establishes consistent contracting policies and practices to be followed by health and human services agencies. The handbook may include standard contract provisions and formats for health and human services agencies to incorporate as applicable in their contracts.

(k) Subject to Section 524.0001(b), the Health and Human Services Commission, in cooperation with the comptroller, shall establish a central contract management database that identifies each contract made with a health and human services agency. The comptroller may use the database to monitor health and human services agency contracts, and health and human services agencies may use the database in contracting. A state agency shall send to the comptroller in the manner prescribed by the comptroller the information the agency possesses that the comptroller requires for inclusion in the database.

(l) The Health and Human Services Commission shall coordinate the procurement practices of all health and human services agencies and encourage those agencies to use efficient procurement practices such as the use of a group purchasing program, combining maintenance contracts into one contract, and obtaining prompt payment discounts. In implementing this duty, the Health and Human Services Commission may review the procurement and rate-setting procedures of each health and human services agency to ensure that amounts paid to contractors are consistent and represent the best value for the state. The Health and Human Services Commission may disapprove a procurement and rate-setting procedure of a health and human services agency. A health and human services agency may not use a procurement or rate-setting procedure that has been disapproved by the commission. The Health and Human Services Commission may transfer the procurement functions of a health and human

services agency to another appropriate state agency if it determines that transferring those functions would be advantageous to the state. Other state agencies and institutions with experience in acquiring goods and services using the procedures allowed under Subsections (c) and (d) shall on request assist the Health and Human Services Commission to perform its functions under this section.

(m) Subject to Section 524.0001(b), the Health and Human Services Commission shall develop and implement a statewide plan to ensure that each entity that contracts with a health and human services agency and any subcontractor of the entity complies with the accessibility requirements of the Americans with Disabilities Act of 1990 (42 U.S.C. Section 12101 et seq.).

(n) To the extent of any conflict, this section prevails over any other state law relating to the procurement of goods and services except a law relating to contracting with historically underutilized businesses or relating to the procurement of goods and services from persons with disabilities.

(o) If the Health and Human Services Commission does not receive any responsive bids on a competitive solicitation for goods or services for a state hospital operated by a health and human services agency or a state supported living center as defined by Section 531.002, Health and Safety Code, the commission after making a written determination that competition is not available may negotiate with and award the contract to any qualified vendor who meets the requirements of the original solicitation:

(1) at a price consistent with the current market value of the goods or services; and

(2) for a term not to exceed five years.

(p) In this section, "health and human services agency" has the meaning assigned by Section 521.0001.

**Credits**
Added by Acts 1997, 75th Leg., ch. 1045, § 1, eff. Sept. 1, 1997. Amended by Acts 1999, 76th Leg., ch. 1460, § 3.11, eff. Sept. 1, 1999; Acts 2003, 78th Leg., ch. 309, § 7.07, eff. June 18, 2003; Acts 2003, 78th Leg., ch. 785, § 75(2), eff. Sept. 1, 2003; Acts 2007, 80th Leg., ch. 937, § 1.09, eff. Sept. 1, 2007; Acts 2015, 84th Leg., ch. 837 (S.B. 200), § 2.08(b)(3), eff. Sept. 1, 2015; Acts 2019, 86th Leg., ch. 953 (S.B. 65), § 16, eff. Sept. 1, 2019; Acts 2021, 87th Leg., ch. 621 (S.B. 1896), § 15, eff. June 14, 2021; Acts 2021, 87th Leg., ch. 855 (S.B. 799), § 9, eff. Sept. 1, 2021; Acts 2023, 88th Leg., ch. 351 (S.B. 1179), § 17, eff. Sept. 1, 2023; Acts 2023, 88th Leg., ch. 769 (H.B. 4611), § 2.20, eff. April 1, 2025; Acts 2025, 89th Leg., ch. 1145 (S.B. 1610), § 27, eff. Sept. 1, 2025.

V. T. C. A., Government Code § 2155.144, TX GOVT § 2155.144
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX TAB 3

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle I. Health and Human Services
        Chapter 533. Medicaid Managed Care Program (Refs & Annos)
          Subchapter A. General Provisions (Refs & Annos)

This section has been updated. Click here for the updated version.

V.T.C.A., Government Code § 533.003

## § 533.003. Considerations in Awarding Contracts

(a) In awarding contracts to managed care organizations, the commission shall:

(1) give preference to organizations that have significant participation in the organization's provider network from each health care provider in the region who has traditionally provided care to Medicaid and charity care patients;

(2) give extra consideration to organizations that agree to assure continuity of care for at least three months beyond the period of Medicaid eligibility for recipients;

(3) consider the need to use different managed care plans to meet the needs of different populations;

(4) consider the ability of organizations to process Medicaid claims electronically; and

(5) in the initial implementation of managed care in the South Texas service region, give extra consideration to an organization that either:

  (A) is locally owned, managed, and operated, if one exists; or

  (B) is in compliance with the requirements of Section 533.004.

(b) The commission, in considering approval of a subcontract between a managed care organization and a pharmacy benefit manager for the provision of prescription drug benefits under Medicaid, shall review and consider whether the pharmacy benefit manager has been in the preceding three years:

(1) convicted of an offense involving a material misrepresentation or an act of fraud or of another violation of state or federal criminal law;

(2) adjudicated to have committed a breach of contract; or

(3) assessed a penalty or fine in the amount of $500,000 or more in a state or federal administrative proceeding.

**Credits**

Added by Acts 1997, 75th Leg., ch. 1262, § 2, eff. June 20, 1997. Amended by Acts 1999, 76th Leg., ch. 1447, § 2, eff. June 19, 1999; Acts 1999, 76th Leg., ch. 1460, § 9.02, eff. Sept. 1, 1999; Acts 2011, 82nd Leg., 1st C.S., ch. 7 (S.B. 7), § 1.02(c), eff. Sept. 28, 2011; Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 2.221, eff. April 2, 2015.

V. T. C. A., Government Code § 533.003, TX GOVT § 533.003
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX TAB 4

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle I. Health and Human Services
        Chapter 536. Medicaid and the Child Health Plan Program: Quality-Based Outcomes and Payments
          Subchapter B. Quality-Based Payments Relating to Managed Care Organizations

This section has been updated. Click here for the updated version.

V.T.C.A., Government Code § 536.052

## § 536.052. Payment and Contract Award Incentives for Managed Care Organizations

(a) The commission may allow a managed care organization participating in the child health plan program or Medicaid increased flexibility to implement quality initiatives in a managed care plan offered by the organization, including flexibility with respect to financial arrangements, in order to:

  (1) achieve high-quality, cost-effective health care;

  (2) increase the use of high-quality, cost-effective delivery models;

  (3) reduce the incidence of unnecessary institutionalization and potentially preventable events; and

  (4) increase the use of alternative payment systems, including shared savings models, in collaboration with physicians and other health care providers.

(b) The commission shall develop quality of care and cost-efficiency benchmarks, including benchmarks based on a managed care organization's performance with respect to reducing potentially preventable events and containing the growth rate of health care costs.

(c) The commission may include in a contract between a managed care organization and the commission financial incentives that are based on the organization's successful implementation of quality initiatives under Subsection (a) or success in achieving quality of care and cost-efficiency benchmarks under Subsection (b).

(d) In awarding contracts to managed care organizations under the child health plan program and Medicaid, the commission shall, in addition to considerations under Section 533.003 of this code and Section 62.155, Health and Safety Code, give preference to an organization that offers a managed care plan that successfully implements quality initiatives under Subsection (a) as determined by the commission based on data or other evidence provided by the organization or meets quality of care and cost-efficiency benchmarks under Subsection (b).

(e) The commission may implement financial incentives under this section only if implementing the incentives would be cost-effective.

**Credits**

Added by Acts 2011, 82nd Leg., 1st C.S., ch. 7 (S.B. 7), § 1.12(a), eff. Sept. 28, 2011. Amended by Acts 2013, 83rd Leg., ch. 1310 (S.B. 7), § 4.13, eff. Sept. 1, 2013; Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 2.265, eff. April 2, 2015; Acts 2015, 84th Leg., ch. 837 (S.B. 200), § 3.25, eff. Jan. 1, 2016; Acts 2015, 84th Leg., ch. 946 (S.B. 277), § 2.25, eff. Jan. 1, 2016.

V. T. C. A., Government Code § 536.052, TX GOVT § 536.052
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX TAB 5

Vernon's Texas Statutes and Codes Annotated
　Government Code (Refs & Annos)
　　Title 4. Executive Branch (Refs & Annos)
　　　Subtitle I. Health and Human Services
　　　　Chapter 533. Medicaid Managed Care Program (Refs & Annos)
　　　　　Subchapter A. General Provisions (Refs & Annos)

This section has been updated. Click here for the updated version.

V.T.C.A., Government Code § 533.0035

## § 533.0035. Certification by Commission

(a) Before the commission may award a contract under this chapter to a managed care organization, the commission shall evaluate and certify that the organization is reasonably able to fulfill the terms of the contract, including all requirements of applicable federal and state law.

(b) Notwithstanding any other law, the commission may not award a contract under this chapter to a managed care organization that does not receive the certification required under this section.

(c) A managed care organization may appeal a denial of certification by the commission under this section.

**Credits**
Added by Acts 2021, 87th Leg., ch. 609 (S.B. 1244), § 1, eff. Sept. 1, 2021.

V. T. C. A., Government Code § 533.0035, TX GOVT § 533.0035
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**　　　　　　　　　　　　　　　　　© 2025 Thomson Reuters. No claim to original U.S. Government Works.



**APPENDIX TAB 6**

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle I. Health and Human Services
        Chapter 533. Medicaid Managed Care Program (Refs & Annos)
          Subchapter A. General Provisions (Refs & Annos)

This section has been updated. Click here for the updated version.

V.T.C.A., Government Code § 533.002

## § 533.002. Purpose

The commission shall implement the Medicaid managed care program by contracting with managed care organizations in a manner that, to the extent possible:

(1) improves the health of Texans by:

   (A) emphasizing prevention;

   (B) promoting continuity of care; and

   (C) providing a medical home for recipients;

(2) ensures that each recipient receives high quality, comprehensive health care services in the recipient's local community;

(3) encourages the training of and access to primary care physicians and providers;

(4) maximizes cooperation with existing public health entities, including local departments of health;

(5) provides incentives to managed care organizations to improve the quality of health care services for recipients by providing value-added services; and

(6) reduces administrative and other nonfinancial barriers for recipients in obtaining health care services.

**Credits**
Added by Acts 1997, 75th Leg., ch. 1262, § 2, eff. June 20, 1997. Amended by Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 2.210, eff. April 2, 2015.

**Editors' Notes**

**REPEAL**

<This section is repealed by Acts 2023, 88th Leg., ch. 769 (H.B 4611), § 3.01(3), effective April 1, 2025. >

V. T. C. A., Government Code § 533.002, TX GOVT § 533.002
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.



# APPENDIX TAB 7

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle I. Health and Human Services
        Chapter 533. Medicaid Managed Care Program (Refs & Annos)
          Subchapter A. General Provisions (Refs & Annos)

This section has been updated. Click here for the updated version.

V.T.C.A., Government Code § 533.001

§ 533.001. Definitions

In this chapter:

(1) "Commission" means the Health and Human Services Commission or an agency operating part of the state Medicaid managed care program, as appropriate.

(2) "Executive commissioner" means the executive commissioner of the Health and Human Services Commission.

(3) "Health and human services agencies" has the meaning assigned by Section 531.001.

(4) "Managed care organization" means a person who is authorized or otherwise permitted by law to arrange for or provide a managed care plan.

(5) "Managed care plan" means a plan under which a person undertakes to provide, arrange for, pay for, or reimburse any part of the cost of any health care services. A part of the plan must consist of arranging for or providing health care services as distinguished from indemnification against the cost of those services on a prepaid basis through insurance or otherwise. The term includes a primary care case management provider network. The term does not include a plan that indemnifies a person for the cost of health care services through insurance.

(6) "Recipient" means a recipient of Medicaid.

(7) "Health care service region" or "region" means a Medicaid managed care service area as delineated by the commission.

**Credits**
Added by Acts 1997, 75th Leg., ch. 1262, § 2, eff. June 20, 1997. Amended by Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 2.209, eff. April 2, 2015.

V. T. C. A., Government Code § 533.001, TX GOVT § 533.001

Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX TAB 8

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle I. Health and Human Services
        Chapter 533. Medicaid Managed Care Program (Refs & Annos)
          Subchapter A. General Provisions (Refs & Annos)

This section has been updated. Click here for the updated version.

V.T.C.A., Government Code § 533.004

## § 533.004. Mandatory Contracts

(a) Subject to the considerations required under Section 533.003 and the certification required under Section 533.0035, in providing health care services through Medicaid managed care to recipients in a health care service region, the commission shall contract with a managed care organization in that region that is licensed under Chapter 843, Insurance Code, to provide health care in that region and that is:

(1) wholly owned and operated by a hospital district in that region;

(2) created by a nonprofit corporation that:

(A) has a contract, agreement, or other arrangement with a hospital district in that region or with a municipality in that region that owns a hospital licensed under Chapter 241, Health and Safety Code, and has an obligation to provide health care to indigent patients; and

(B) under the contract, agreement, or other arrangement, assumes the obligation to provide health care to indigent patients and leases, manages, or operates a hospital facility owned by the hospital district or municipality; or

(3) created by a nonprofit corporation that has a contract, agreement, or other arrangement with a hospital district in that region under which the nonprofit corporation acts as an agent of the district and assumes the district's obligation to arrange for services under the Medicaid expansion for children as authorized by Chapter 444, Acts of the 74th Legislature, Regular Session, 1995.

(b) A managed care organization described by Subsection (a) is subject to all terms and conditions to which other managed care organizations are subject, including all contractual, regulatory, and statutory provisions relating to participation in the Medicaid managed care program.

(c) The commission shall make the awarding and renewal of a mandatory contract under this section to a managed care organization affiliated with a hospital district or municipality contingent on the district or municipality entering into a matching funds agreement to expand Medicaid for children as authorized by Chapter 444, Acts of the 74th Legislature, Regular Session,

1995. The commission shall make compliance with the matching funds agreement a condition of the continuation of the contract with the managed care organization to provide health care services to recipients.

(d) Subsection (c) does not apply if:

(1) the commission does not expand Medicaid for children as authorized by Chapter 444, Acts of the 74th Legislature, Regular Session, 1995; or

(2) a waiver from a federal agency necessary for the expansion is not granted.

(e) In providing health care services through Medicaid managed care to recipients in a health care service region, with the exception of the Harris service area for the STAR Medicaid managed care program, as defined by the commission as of September 1, 1999, the commission shall also contract with a managed care organization in that region that holds a certificate of authority as a health maintenance organization under Chapter 843, Insurance Code, and that:

(1) is certified under Section 162.001, Occupations Code;

(2) is created by The University of Texas Medical Branch at Galveston; and

(3) has obtained a certificate of authority as a health maintenance organization to serve one or more counties in that region from the Texas Department of Insurance before September 2, 1999.

**Credits**
Added by Acts 1997, 75th Leg., ch. 1262, § 2, eff. June 20, 1997. Amended by Acts 1999, 76th Leg., ch. 1447, § 3, eff. June 19, 1999; Acts 1999, 76th Leg., ch. 1460, § 9.03, eff. Sept. 1, 1999; Acts 2001, 77th Leg., ch. 1420, § 14.766, eff. Sept. 1, 2001; Acts 2003, 78th Leg., ch. 1276, § 10A.515, eff. Sept. 1, 2003; Acts 2021, 87th Leg., ch. 609 (S.B. 1244), § 2, eff. Sept. 1, 2021.

V. T. C. A., Government Code § 533.004, TX GOVT § 533.004
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX TAB 9

Vernon's Texas Statutes and Codes Annotated
  Health and Safety Code (Refs & Annos)
    Title 2. Health
      Subtitle C. Programs Providing Health Care Benefits and Services
        Chapter 62. Child Health Plan for Certain Low-Income Children (Refs & Annos)
          Subchapter D. Child Health Plan

V.T.C.A., Health & Safety Code § 62.155

## § 62.155. Health Plan Providers

Currentness

(a) The commission shall select the health plan providers under the program through a competitive procurement process. A health plan provider, other than a state administered primary care case management network, must hold a certificate of authority or other appropriate license issued by the Texas Department of Insurance that authorizes the health plan provider to provide the type of child health plan offered and must satisfy, except as provided by this chapter, any applicable requirement of the Insurance Code or another insurance law of this state.

(b) A managed care organization or other entity shall seek to obtain, in the organization's or entity's provider network, the participation of significant traditional providers, as defined by commission rule, if that organization or entity:

(1) contracts with the commission or with another agency or entity to operate a part of the child health plan under this chapter; and

(2) uses a provider network to provide or arrange for health care services under the child health plan.

(c) In selecting a health plan provider, the commission:

(1) may give preference to a person who provides similar coverage under the Medicaid program; and

(2) shall provide for a choice of at least two health plan providers in each service area.

(d) The executive commissioner may authorize an exception to Subsection (c)(2) if there is only one acceptable applicant to become a health plan provider in the service area.

**Credits**
Added by Acts 1999, 76th Leg., ch. 235, § 1, eff. Aug. 30, 1999. Amended by Acts 2003, 78th Leg., ch. 198, § 2.52, eff. Sept. 1, 2003; Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 3.0205, eff. April 2, 2015.

V. T. C. A., Health & Safety Code § 62.155, TX HEALTH & S § 62.155

Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX TAB 10

Texas Administrative Code
  Title 1. Administration
    Part 15. Texas Health and Human Services Commission
      Chapter 391. Purchase of Goods and Services by the Texas Health and Human Services Commission
        Subchapter A. General Provisions

1 TAC § 391.101

## § 391.101. Purpose

Currentness

The purpose of these rules is to:

(1) provide transparency to the public, the legislature, state agencies, and vendors on the procedures followed by HHSC procurement personnel;

(2) provide for consistent and uniform management of procurement and contracting processes; and

(3) obtain best value when purchasing goods and services to better serve Texas residents and businesses.

**Credits**
**Source:** The provisions of this §391.101 adopted to be effective May 12, 2021, 46 TexReg 3017; amended to be effective May 10, 2022, 47 TexReg 2732.

Current through 50 Tex.Reg. No. 7460, dated November 14, 2025, as effective on or before November 21, 2025. Some sections may be more current. See credits for details.

1 TAC § 391.101, 1 TX ADC § 391.101

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX TAB 11

Texas Administrative Code
Title 1. Administration
Part 15. Texas Health and Human Services Commission
Chapter 391. Purchase of Goods and Services by the Texas Health and Human Services Commission
Subchapter B. Procurement and Special Contracting Methods
Division 1. Procurement Methods

1 TAC § 391.209

## § 391.209. Request for Proposals

Currentness

Goods or services may be purchased through a Request for Proposals (RFP) as authorized by this section.

(1) Advertisement. Public notice of the issuance of an RFP is posted on the Electronic State Business Daily in accordance with Texas Government Code §2155.083. The solicitation must include evaluation and selection criteria and the process for making a selection.

(2) Minor irregularities in a response. HHSC may waive a minor irregularity or permit a respondent to correct a minor irregularity in a response, if the irregularity:

(A) is purely a matter of form rather than substance; and

(B) does not materially affect price, quality, or delivery of the desired goods or services.

(3) Evaluation and selection. HHSC utilizes an evaluation method which provides for:

(A) the fair consideration of proposals; and

(B) if applicable, a process for determining the competitive range.

(4) Negotiations.

(A) HHS or DFPS may discuss acceptable or potentially acceptable proposals with respondents to assess a respondent's ability to meet the solicitation requirements.

(B) After receiving a proposal but before making an award, HHS or DFPS may permit the respondent to revise its proposal to obtain the best and final offer at any stage in the evaluation or negotiation process.

(5) Award. A contract is awarded to the respondent whose proposal offers the best value for the state in accordance with Texas Government Code §2155.144.

**Credits**
**Source:** The provisions of this §391.209 adopted to be effective May 12, 2021, 46 TexReg 3017; amended to be effective May 10, 2022, 47 TexReg 2732.

Current through 50 Tex.Reg. No. 7460, dated November 14, 2025, as effective on or before November 21, 2025. Some sections may be more current. See credits for details.

1 TAC § 391.209, 1 TX ADC § 391.209

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX TAB 12

Texas Administrative Code
  Title 34. Public Finance
    Part 1. Comptroller of Public Accounts
      Chapter 20. Statewide Procurement and Support Services
        Subchapter C. Procurement Methods and Contract Formation
          Division 2. Procurement Methods

34 TAC § 20.208

## § 20.208. Competitive Sealed Proposals

Currentness

(a) Availability of method. A state agency may follow the competitive sealed proposals procurement method to acquire goods or services if it determines that competitive sealed bidding and informal competitive bidding are not practical or are disadvantageous to the state.

(b) Solicitation of proposals. A state agency shall:

(1) solicit proposals under this subchapter by making available a request for proposals that contains all the information needed to submit a responsive proposal, the factors other than price that will be used to determine best value for the state, and the criteria that will be used to evaluate factors other than price; and

(2) give public notice of the request for proposals on the ESBD and distribute notice to the CMBL in the manner provided in this subchapter.

(c) Opening of proposals; respondent list. A state agency may not open proposals until the published deadline for submitting a proposal has passed, and shall maintain a list of respondents that submitted a proposal in response to each request for proposal.

(d) Negotiation of proposals.

(1) A state agency may discuss acceptable or potentially acceptable proposals with a respondent to assess its ability to meet the specifications of the solicitation. A potentially acceptable offer is any offer which the state agency determines to be reasonably considered for award selection. When the division is carrying out a request for proposals, it may invite a state agency to participate in discussions with respondents.

(2) After receiving a proposal but before making an award, a state agency may permit the respondent to revise its proposal one or more times to obtain the best and final offer.

(3) A state agency may not disclose information derived from proposals or discussions with a respondent to any competing respondent prior to award or cancellation of the solicitation.

(4) A state agency shall provide each respondent that submitted an acceptable or potentially acceptable proposal an equal opportunity to discuss and revise proposals.

(e) Contract award.

(1) A state agency may award a contract to the respondent whose proposal offers the best value for the state.

(2) A state agency shall refuse all offers if none is acceptable, and may refuse any offer that is not in the best interest of the state.

(3) A state agency shall determine which proposal offers the best value for the state in accordance with Government Code, §§2155.074, 2155.075 and 2156.125, as applicable.

(4) A state agency shall document and retain the reasons for making an award in the contract file.

**Credits**
**Source:** The provisions of this §20.208 adopted to be effective January 24, 2017, 42 TexReg 233; amended to be effective May 1, 2022, 47 TexReg 2558.

Current through 50 Tex.Reg. No. 7460, dated November 14, 2025, as effective on or before November 21, 2025. Some sections may be more current. See credits for details.

34 TAC § 20.208, 34 TX ADC § 20.208

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX TAB 13

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 5. Open Government; Ethics (Refs & Annos)
      Subtitle A. Open Government
        Chapter 552. Public Information (Refs & Annos)
          Subchapter C. Information Excepted from Required Disclosure

V.T.C.A., Government Code § 552.104

§ 552.104. Exception: Information Related to Competition or Bidding

Currentness

(a) Information is excepted from the requirements of Section 552.021 if a governmental body demonstrates that release of the information would harm its interests by providing an advantage to a competitor or bidder in a particular ongoing competitive situation or in a particular competitive situation where the governmental body establishes the situation at issue is set to reoccur or there is a specific and demonstrable intent to enter into the competitive situation again in the future.

(b) Except as provided by Subsection (c), the requirement of Section 552.022 that a category of information listed under Section 552.022(a) is public information and not excepted from required disclosure under this chapter unless expressly confidential under law does not apply to information that is excepted from required disclosure under this section.

(c) Subsection (b) does not apply to information described by Section 552.022(a) relating to the receipt or expenditure of public or other funds by a governmental body for a parade, concert, or other entertainment event paid for in whole or part with public funds. A person, including a governmental body, may not include a provision in a contract related to an event described by this subsection that prohibits or would otherwise prevent the disclosure of information described by this subsection. A contract provision that violates this subsection is void.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993. Amended by Acts 2001, 77th Leg., ch. 1272, § 7.01, eff. June 15, 2001; Acts 2019, 86th Leg., ch. 45 (H.B. 81), § 1, eff. May 17, 2019; Acts 2019, 86th Leg., ch. 1216 (S.B. 943), § 3, eff. Jan. 1, 2020.

V. T. C. A., Government Code § 552.104, TX GOVT § 552.104
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX TAB 14



THE OFFICE OF THE ATTORNEY GENERAL OF TEXAS

October 11, 2023

Ms. Sandy Cardiff
Legal Assistant
Health and Human Services Commission
4601 West Guadalupe Street Mail Code 1070
Austin, TX 78751

OR2023-034773

Re: Request for A07252023.0450015

Dear Ms. Cardiff,

The Office of the Attorney General has received your request for a ruling and assigned your request ID# 23-087074.

After reviewing your arguments and the submitted information, we have determined your request does not present a novel or complex issue. Thus, we are addressing your claims in a memorandum opinion. You claim the submitted information may be withheld from the requestor pursuant to section 552.104 of the Government Code. Upon review of your arguments and the submitted information, we conclude you may withhold the submitted information under section 552.104.

For more information on the cited exception, please refer to the open government information on our website at https://www.texasattorneygeneral.gov/open-government/governmental-bodies/open-records-memorandum-rulings. You may also contact our Open Government Hotline at 1-877-OPENTEX.

Enc.   Submitted Documents

c:     Requestor
       (w/o encosures)

# APPENDIX TAB 15



May 23, 2024

Mr. Jonathan Miles
Director, Open Records Department
Texas Health and Human Services Commission
P.O. Box 13247
Austin, Texas 78711-3247

OR2024-018260

Dear Mr. Miles:

You ask whether certain information is subject to required public disclosure under the Public Information Act (the "Act"), chapter 552 of the Government Code. Your request was assigned ID# 24-014077 (HHSC ORR Nos. A0308024.0450022, A03122024.0450007, A03132024.0450018, A03142024.0450003, A03142024.0450004, A03152024.0450020, A03222024.0450024, A04042024.0450030, A04052024.0450016, A04082024.0450009, and A04092024.0450013).

The Texas Health and Human Services Commission (the "commission") received eleven requests from ten different requestors for information pertaining to a specified request for proposals. You state you will release some information. You claim the submitted information is excepted from disclosure under sections 552.103 and 552.104 of the Government Code. We have received comments from the first requestor. *See* Gov't Code § 552.304 (interested party may submit comments stating why information should or should not be released). We have considered the submitted arguments and reviewed the submitted information.

Initially, you inform us the commission wishes to withdraw its request for an open records decision with respect to the request for information with commission reference number A03152024.0450020 because the commission will release the records at issue to the requestor. This ruling does not address the public availability of the information the commission no longer seeks to withhold.

Next, you state some of the requested information was the subject of previous requests for information, in response to which this office issued Open Records Letter Nos. 2023-20925 (2023) and 2023-34773 (2023). We have no indication the law, facts, and circumstances

on which the prior rulings were based have changed. Thus, the commission may continue to rely on Open Records Letter Nos. 2023-20925 and 2023-34773 as previous determinations and withhold the information at issue in accordance with those rulings. *See* Open Records Decision No. 673 (2001) (so long as law, facts, and circumstances on which prior ruling was based have not changed, first type of previous determination exists where requested information is precisely same information as was addressed in prior attorney general ruling, ruling is addressed to same governmental body, and ruling concludes that information is or is not excepted from disclosure).

Further, the first requestor asserts the commission failed to comply with section 552.301 of the Government Code. Section 552.301 of the Government Code prescribes the procedures a governmental body must follow in asking this office to decide whether requested information is excepted from public disclosure. *See* Gov't Code § 552.301. Pursuant to section 552.301(b), a governmental body must ask for a decision from this office and state the exceptions that apply within ten business days of receiving the written request. *See id.* § 552.301(b). Pursuant to section 552.301(e), a governmental body is required to submit to this office within fifteen business days of receiving an open records request (1) written comments stating the reasons why the claimed exceptions apply that would allow the information to be withheld, (2) a copy of the written request for information, (3) a signed statement or sufficient evidence showing the date the governmental body received the written request, and (4) a copy of the specific information requested or representative samples, labeled to indicate which exceptions apply to which parts of the documents. *See id.* § 552.301(e). In this instance, you state, and provide documentation showing, the commission received the first request for information on March 8, 2024. This office only counts business days as provided by section 552.0031 of the Government Code. *Id.* §§ 552.0031 (defining "business day" for purposes of the Act). Consequently, the commission's ten and fifteen-business-day deadlines were March 22, 2024, and March 29, 2024, respectively. The commission provided the information required by sections 552.301(b) and 552.301(e) via hand delivery on March 19, 2024, and March 28, 2024, respectively. *See id.* § 552.308 (describing rules for calculating submission dates of documents sent via first class United States mail). Accordingly, we find the commission complied with section 552.301 of the Government Code in requesting a decision from this office. Therefore, we will address your submitted arguments against disclosure of the information at issue.

Section 552.104(a) of the Government Code excepts from disclosure information that a governmental body demonstrates, if released, would "harm its interests by providing an advantage to a competitor or bidder in a particular ongoing competitive situation or in a particular competitive situation where the governmental body establishes the situation at issue is set to reoccur or there is a specific and demonstrable intent to enter into the competitive situation again in the future." *Id.* § 552.104(a). The "test under section 552.104 is whether knowing another bidder's [or competitor's information] would be an advantage, not whether it would be a decisive advantage." *Boeing Co. v. Paxton*, 466 S.W.3d 831, 841 (Tex. 2015). After review of the information at issue and consideration of the arguments, we find the commission has established the applicability of section

552.104(a) to the information at issue. Accordingly, we conclude the commission may withhold the submitted information under section 552.104(a) of the Government Code.[1]

This letter ruling is limited to the particular information at issue in this request and limited to the facts as presented to us; therefore, this ruling must not be relied upon as a previous determination regarding any other information or any other circumstances.

This ruling triggers important deadlines regarding the rights and responsibilities of the governmental body and of the requestor. For more information concerning those rights and responsibilities, please visit our website at https://www.texasattorneygeneral.gov/open-government/members-public/what-expect-after-ruling-issued or call the OAG's Open Government Hotline, toll free, at (877) 673-6839. Questions concerning the allowable charges for providing public information under the Public Information Act may be directed to the Cost Rules Administrator of the OAG, toll free, at (888) 672-6787.

Sincerely,

D. Michelle Case
Assistant Attorney General
Open Records Division

DMH/tb

Ref:    ID# 24-014077

c:      10 Requestors

---

[1] As our ruling is dispositive, we need not address your remaining argument against disclosure of this information.

# APPENDIX TAB 16



May 30, 2024

Mr. Jonathan Miles
Open Records
Texas Health and Human Services Commission
P.O. Box 13247
Austin, Texas 78711

OR2024-019071

Dear Mr. Miles:

You ask whether certain information is subject to required public disclosure under the Public Information Act (the "Act"), chapter 552 of the Government Code. Your request was assigned ID# 24-014901 (ORR A03192024.0450006).

The Texas Health and Human Services Commission (the "commission") received a request for information pertaining to a specified request for proposal. You state you will release some information. You also state you will rely on Open Records Letter Nos. 2023-34773 (2023) and 2023-20925 (2003) with respect to some of the requested information.[1] You claim the submitted information is excepted from disclosure under sections 552.103, 552.104, 552.107, and 552.111 of the Government Code. We have considered the exceptions you claim and reviewed the submitted representative sample of information.[2] We have also received and considered comments from the requestor. See Gov't Code § 552.304 (interested party may submit comments stating why information should or should not be released).

Section 552.104(a) of the Government Code excepts from disclosure information that a governmental body demonstrates, if released, would "harm its interests by providing an advantage to a competitor or bidder in a particular ongoing competitive situation or in a

---

[1] See Open Records Decision No. 673 (2001) (so long as law, facts, and circumstances on which prior ruling was based have not changed, first type of previous determination exists where requested information is precisely same information as was addressed in a prior attorney general ruling, ruling is addressed to same governmental body, and ruling concludes that information is or is not excepted from disclosure).

[2] We assume the "representative sample" of records submitted to this office is truly representative of the requested records as a whole. See Open Records Decision Nos. 499 (1988), 497 (1988). This open records letter does not reach, and therefore does not authorize the withholding of, any other requested records to the extent those records contain substantially different types of information than that submitted to this office.

particular competitive situation where the governmental body establishes the situation at issue is set to reoccur or there is a specific and demonstrable intent to enter into the competitive situation again in the future." *Id.* § 552.104(a). The "test under section 552.104 is whether knowing another bidder's [or competitor's information] would be an advantage, not whether it would be a decisive advantage." *Boeing Co. v. Paxton*, 466 S.W.3d 831, 841 (Tex. 2015). After review of the information at issue and consideration of the arguments, we find the commission has established the applicability of section 552.104(a) to the information at issue. Accordingly, we conclude the commission may withhold the submitted information under section 552.104(a) of the Government Code.[3]

This letter ruling is limited to the particular information at issue in this request and limited to the facts as presented to us; therefore, this ruling must not be relied upon as a previous determination regarding any other information or any other circumstances.

This ruling triggers important deadlines regarding the rights and responsibilities of the governmental body and of the requestor. For more information concerning those rights and responsibilities, please visit our website at https://www.texasattorneygeneral.gov/open-government/members-public/what-expect-after-ruling-issued or call the OAG's Open Government Hotline, toll free, at (877) 673-6839. Questions concerning the allowable charges for providing public information under the Public Information Act may be directed to the Cost Rules Administrator of the OAG, toll free, at (888) 672-6787.

Sincerely,

Vi Thanh Hoang
Assistant Attorney General
Open Records Division

VTH/jxd

Ref:    ID# 24-014901

c:      Requestor

---

[3] As our ruling is dispositive, we need not address your remaining argument against disclosure of this information.

# APPENDIX TAB 17

Texas Administrative Code
  Title 1. Administration
    Part 15. Texas Health and Human Services Commission
      Chapter 391. Purchase of Goods and Services by the Texas Health and Human Services Commission
        Subchapter C. Protests

1 TAC § 391.303
Formerly cited as 1 TX ADC § 391.403

§ 391.303. Applicability

Currentness

(a) For purposes of this subchapter, HHS is defined as the Texas Health and Human Services Commission, the Texas Department of State Health Services, the Texas Department of Family and Protective Services, and the Texas Civil Commitment Office.

(b) A respondent may protest a solicitation, response evaluation, or contract award if the respondent is able to specifically identify a statutory or regulatory provision that HHS allegedly violated.

(c) This subchapter does not apply to:

(1) the award of grants or subcontracts;

(2) interagency or interlocal agreements executed in accordance with applicable law;

(3) open enrollment contracts;

(4) rejected applications, purchases, or contract awards in relation to HHSC's group purchasing organizations program; or

(5) direct contract awards as specified in §391.247 of this chapter (relating to Direct Contract Award).

(d) HHSC will not consider protests filed pursuant to this subchapter as contested cases under the Administrative Procedure Act, Texas Government Code, Chapter 2001.

**Credits**
**Source:** The provisions of this §391.303 adopted to be effective May 12, 2021, 46 TexReg 3017; amended to be effective May 10, 2022, 47 TexReg 2732.

Current through 50 Tex.Reg. No. 7460, dated November 14, 2025, as effective on or before November 21, 2025. Some sections may be more current. See credits for details.

1 TAC § 391.303, 1 TX ADC § 391.303

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX TAB 18

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle I. Health and Human Services
        Chapter 524. Authority over Health and Human Services System
          Subchapter A. System Oversight Authority of Commission

V.T.C.A., Government Code § 524.0002

Formerly cited as TX GOVT § 531.0055

## § 524.0002. General Responsibility of Executive Commissioner for Health and Human Services System

Currentness

(a) The executive commissioner, as necessary to perform the functions described by Section 524.0001 and Subchapter E in implementing applicable policies the executive commissioner establishes for a health and human services agency or division, shall:

(1) manage and direct the operations of each agency or division, as applicable;

(2) supervise and direct the activities of each agency commissioner or division director, as applicable; and

(3) be responsible for the administrative supervision of the internal audit program for the agencies, including:

(A) selecting the director of internal audit;

(B) ensuring the director of internal audit reports directly to the executive commissioner; and

(C) ensuring the independence of the internal audit function.

(b) The executive commissioner's operational authority and responsibility for purposes of Subsection (a) and Section 524.0151(a)(2) for each health and human services agency or division, as applicable, includes authority over and responsibility for:

(1) daily operations management of the agency or division, including the organization, management, and operating procedures of the agency or division;

(2) resource allocation within the agency or division, including the use of federal funds the agency or division receives;

(3) personnel and employment policies;

(4) contracting, purchasing, and related policies, subject to this chapter and other laws relating to contracting and purchasing by a state agency;

(5) information resources systems the agency or division uses;

(6) facility location; and

(7) the coordination of agency or division activities with activities of other components of the health and human services system and state agencies.

**Credits**

Added by Acts 2023, 88th Leg., ch. 769 (H.B. 4611), § 1.01, eff. April 1, 2025.

<Chapter 524 added as a nonsubstantive revision by Acts 2023, 88th Leg., ch. 769 (H.B. 4611) § 1.01, effective April 1, 2025.>

V. T. C. A., Government Code § 524.0002, TX GOVT § 524.0002

Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX TAB 19

Texas Administrative Code
  Title 1. Administration
    Part 15. Texas Health and Human Services Commission
      Chapter 391. Purchase of Goods and Services by the Texas Health and Human Services Commission
        Subchapter C. Protests

1 TAC § 391.307
Formerly cited as 1 TX ADC § 391.407

## § 391.307. Review and Disposition of Protests

Currentness

(a) Upon receipt of a protest, the Deputy Executive Commissioner of Procurement and Contracting Services may:

(1) dismiss the protest if:

    (A) it is not timely; or

    (B) it does not meet the requirements of §391.305 of this subchapter (relating to Filing of a Protest);

(2) solicit written responses to the protest from other interested parties; or

(3) attempt to resolve the protest by mutual agreement.

(b) The Deputy Executive Commissioner of Procurement and Contracting Services may confer with the HHSC Chief Counsel at any time during the review of the protest.

(c) If the protest is not dismissed or resolved by mutual agreement, the Deputy Executive Commissioner of Procurement and Contracting Services will issue a written determination on the protest.

(1) If the Deputy Executive Commissioner of Procurement and Contracting Services determines that no violation of the specific statutory or regulatory provision cited by the protestant has occurred, they shall so inform the protestant and other interested parties by letter that sets forth the reasons for the determination.

(2) If the Deputy Executive Commissioner of Procurement and Contracting Services determines that HHS violated the specific statutory or regulatory provision cited by the protestant in a case where HHS has not awarded a contract, they shall so inform the protestant and other interested parties by letter that sets forth the reasons for the determination and any appropriate remedial action.

(3) If the Deputy Executive Commissioner of Procurement and Contracting Services determines that HHS violated the specific statutory or regulatory provision cited by the protestant in a case where HHS awarded a contract, they shall so inform the protestant and other interested parties by letter that sets forth the reasons for the determination, which may include ordering the contract void.

(4) The Deputy Executive Commissioner of Procurement and Contracting Services' written determination is the final administrative action by HHSC on a protest filed under this subchapter unless the protestant files an appeal of the determination under subsection (d) of this section.

(d) The protestant may appeal the Deputy Executive Commissioner of Procurement and Contracting Services' determination on a protest to the HHSC Executive Commissioner. The appeal must be in writing and submitted by electronic mail to HHSCExecutiveCommissioner@hhs.texas.gov no later than 10 business days after the date of the Deputy Executive Commissioner of Procurement and Contracting Services' determination. The appeal shall be limited to review of the Deputy Executive Commissioner of Procurement and Contracting Services' determination. The protestant must mail or deliver copies of the appeal to other interested parties, and each copy must contain a certified statement that such copies have been provided.

(1) A protest or appeal that is not timely filed shall not be considered unless good cause for delay is shown or the HHSC Executive Commissioner determines that an appeal raises issues that are significant to HHSC's procurement practices or procedures in general.

(2) The HHSC Executive Commissioner may confer with the HHSC Chief Counsel at any time during the review of the appeal.

(3) The HHSC Executive Commissioner will review the appeal of the Deputy Executive Commissioner of Procurement and Contracting Services' determination and render a final decision on the protest issues.

(4) A decision issued in writing by the HHSC Executive Commissioner shall be the final administrative action of HHSC on a protest determination that is appealed under this subchapter.

**Credits**
**Source:** The provisions of this §391.307 adopted to be effective May 12, 2021, 46 TexReg 3017.

Current through 50 Tex.Reg. No. 7460, dated November 14, 2025, as effective on or before November 21, 2025. Some sections may be more current. See credits for details.

1 TAC § 391.307, 1 TX ADC § 391.307

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Warren Huang on behalf of Warren Huang
Bar No. 796788
warren.huang@nortonrosefulbright.com
Envelope ID: 108906116
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief Requesting Oral Argument
Status as of 12/9/2025 4:50 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michaelle Peters | | mpeters@scottdoug.com | 12/9/2025 4:20:34 PM | SENT |
| Julie Wright | | julie.wright@nortonrosefulbright.com | 12/9/2025 4:20:34 PM | SENT |
| Amanda DoddsPrice | | amanda.price@squirepb.com | 12/9/2025 4:20:34 PM | SENT |
| Mandy Patterson | | mpatterson@adjtlaw.com | 12/9/2025 4:20:34 PM | SENT |
| Michelle Joyner | | mjoyner@scottdoug.com | 12/9/2025 4:20:34 PM | SENT |
| Abril Rivera | | arivera@scottdoug.com | 12/9/2025 4:20:34 PM | SENT |
| Nancy Villarreal | | nancy.villarreal@oag.texas.gov | 12/9/2025 4:20:34 PM | SENT |
| Jessie Johnson | | jessie.johnson@nortonrosefulbright.com | 12/9/2025 4:20:34 PM | SENT |
| David Johns | | david@cobbjohns.com | 12/9/2025 4:20:34 PM | SENT |
| Cory Scanlon | | cory.scanlon@oag.texas.gov | 12/9/2025 4:20:34 PM | SENT |
| Stacey Jett | | sjett@adjltaw.com | 12/9/2025 4:20:34 PM | SENT |
| Victor Hernandez | | victor.hernandez@oag.texas.gov | 12/9/2025 4:20:34 PM | SENT |

Associated Case Party: Cook Children's Health Plan

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Karen Burgess | 796276 | kburgess@burgesslawpc.com | 12/9/2025 4:20:34 PM | SENT |
| Anna Baker | 791362 | abaker@adjtlaw.com | 12/9/2025 4:20:34 PM | SENT |
| Amy Warr | 795708 | awarr@adjtlaw.com | 12/9/2025 4:20:34 PM | SENT |
| Juliana Bennington | | jbennington@perkinscoie.com | 12/9/2025 4:20:34 PM | SENT |
| Jonathan Hawley | | jhawley@perkinscoie.com | 12/9/2025 4:20:34 PM | SENT |
| Trisha Marino | | tmarino@perkinscoie.com | 12/9/2025 4:20:34 PM | SENT |
| Perkins Docketing Team | | DocketSEA@perkinscoie.com | 12/9/2025 4:20:34 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Warren Huang on behalf of Warren Huang
Bar No. 796788
warren.huang@nortonrosefulbright.com
Envelope ID: 108906116
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief Requesting Oral Argument
Status as of 12/9/2025 4:50 PM CST

Associated Case Party: Cook Children's Health Plan

| | | | | |
|---|---|---|---|---|
| Perkins Docketing Team | | DocketSEA@perkinscoie.com | 12/9/2025 4:20:34 PM | SENT |
| Katie Dolan-Galaviz | | kgalaviz@burgesslawpc.com | 12/9/2025 4:20:34 PM | SENT |
| Matthew Gordon | | mgordon@perkinscoie.com | 12/9/2025 4:20:34 PM | SENT |

Associated Case Party: Texas Children's Health Plan

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Mark Emery | 24050564 | mark.emery@nortonrosefulbright.com | 12/9/2025 4:20:34 PM | SENT |
| Warren Huang | 796788 | warren.huang@nortonrosefulbright.com | 12/9/2025 4:20:34 PM | SENT |
| Paul Trahan | 24003075 | paul.trahan@nortonrosefulbright.com | 12/9/2025 4:20:34 PM | SENT |
| Susan Harris | 6876980 | susan.harris@nortonrosefulbright.com | 12/9/2025 4:20:34 PM | SENT |
| Thomas Coulter | 4885500 | tom.coulter@nortonrosefulbright.com | 12/9/2025 4:20:34 PM | SENT |
| Kayla Ahmed | | kayla.ahmed@nortonrosefulbright.com | 12/9/2025 4:20:34 PM | SENT |

Associated Case Party: Wellpoint Insurance Company

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Robert Johnson | 10786400 | rjohnson@foley.com | 12/9/2025 4:20:34 PM | SENT |
| Michelle Ku | 24071452 | mku@foley.com | 12/9/2025 4:20:34 PM | SENT |
| Kristin Hernandez | | kristin.hernandez@foley.com | 12/9/2025 4:20:34 PM | SENT |
| Benjamin Grossman | | bjgrossman@foley.com | 12/9/2025 4:20:34 PM | SENT |
| Stacey Obenhaus | | sobenhaus@foley.com | 12/9/2025 4:20:34 PM | SENT |

Associated Case Party: Superior Healthplan Inc.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Warren Huang on behalf of Warren Huang
Bar No. 796788
warren.huang@nortonrosefulbright.com
Envelope ID: 108906116
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief Requesting Oral Argument
Status as of 12/9/2025 4:50 PM CST

Associated Case Party: Superior Healthplan Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Richard Phillips | 24032833 | Rich.Phillips@hklaw.com | 12/9/2025 4:20:34 PM | SENT |
| J McCaig | 24070083 | meghan.mccaig@outlook.com | 12/9/2025 4:20:34 PM | SENT |
| Karen Walker | | karen.walker@hklaw.com | 12/9/2025 4:20:34 PM | SENT |
| Tiffany Roddenberry | | tiffany.roddenberry@hklaw.com | 12/9/2025 4:20:34 PM | SENT |

Associated Case Party: Texas Health and Human Services

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Victoria Gomez | | victoria.gomez@oag.texas.gov | 12/9/2025 4:20:34 PM | SENT |
| Jennifer Cook | | Jennifer.Cook@oag.texas.gov | 12/9/2025 4:20:34 PM | SENT |

Associated Case Party: Aetna Better Health of Texas, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Joseph Knight | 11601275 | jknight@ebbklaw.com | 12/9/2025 4:20:34 PM | SENT |

Associated Case Party: Cecile Erwin Young, Texas Health and Human Services

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Cory Scanlon | 24104599 | cory.scanlon@oag.texas.gov | 12/9/2025 4:20:34 PM | SENT |
| William FCole | | William.Cole@oag.texas.gov | 12/9/2025 4:20:34 PM | SENT |
| Jeffrey Stephens | | jeff.stephens@oag.texas.gov | 12/9/2025 4:20:34 PM | SENT |
| Mohmed Patel | | mohmed.patel@oag.texas.gov | 12/9/2025 4:20:34 PM | SENT |

Associated Case Party: Molina Healthcare of Texas, Inc.

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Warren Huang on behalf of Warren Huang
Bar No. 796788
warren.huang@nortonrosefulbright.com
Envelope ID: 108906116
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief Requesting Oral Argument
Status as of 12/9/2025 4:50 PM CST

Associated Case Party: Molina Healthcare of Texas, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Jason R.LaFond | | jlafond@scottdoug.com | 12/9/2025 4:20:34 PM | SENT |
| Cheryl LaFond | 24104015 | clafond@scottdoug.com | 12/9/2025 4:20:34 PM | SENT |